OPINION OF THE COURT
Arthur S. Hirsch, J.
In this action based in equity, defendant landlords seek to evict plaintiff tenant from an apartment in a private dwelling that has been occupied and maintained as a multiple dwelling, contrary to law, and plaintiff tenant for her part, seeks injunctive relief to force the landlords to restore the service of *481 free gas, electricity and hot water which has been supplied to her since she first occupied the premises in 1954.
The incredible facts that underlie this lawsuit, as found by the court, are as follows:
Defendants, Mr. and Mrs. Harris, both senior citizens, own a legal two-family frame dwelling on Gates Avenue in Brooklyn, occupied by three families contrary to the certificate of occupancy. The plaintiff has lived in the basement apartment since 1954 as a month-to-month tenant. The monthly rental of $75 included free gas, water and electricity. In January of
1970, a violation from the Department of Buildings was issued to defendants for converting the premises into an illegal three-family dwelling which directed the landlords to "restore the premises to lawful occupancy.”
Attempting to remove the violation, the defendants brought a holdover proceeding in landlord-tenant court that resulted in judgment for the landlords. The Appellate Term reversed on grounds that: (1) no actual vacate order had been issued by the Department of Buildings; and (2) the violation had not been caused by the tenant.
In what appears to be an astute appraisal of her position in this novel circumstance, the tenant discontinued paying rent in March, 1971, but did not vacate the premises. In April,
1971, the Office of Rent Control determined that the apartment, though illegal, was rent controlled and set the rent at $59 per month. A year later, the landlords instituted a summary proceeding to collect all arrears at the $59 per month scale. Judgment was granted but was reversed by the Appellate Term on grounds that the failure to register the premises as a multiple dwelling precluded the landlords from maintaining a summary procedure predicated upon nonpayment of rent. The landlords, however, are unable to obtain a multiple dwelling registration since the building department will only issue a registration number based on the "legal” occupancy of the building — in this case a two-family building.
The landlords tried to extricate themselves from this quagmire by seeking a certificate of eviction under section 59 of the Rent, Eviction and Rehabilitation Regulations, alleging they wished to withdraw the apartment from the rental market. Their application was denied. Their next approach was to sue in Civil Court for "use and occupation.” Plaintiff’s motion to dismiss for res judicata was denied by the Trial Term but reversed by Appellate Term, who specifically would *482 not permit the landlords to use a "use and occupancy action” to evade the effect of its decision on the previous nonpayment of rent action. The Appellate Division affirmed without opinion. In November, 1975, defendant commenced another proceeding in the landlord-tenant court for nonpayment of rent, which was dismissed on the same ground — failure to supply a multiple dwelling registration number.
After four and one-half years of supplying services without collecting one penny in rentals, the landlords, in December, 1975, started to cut off services, except for heat, and by March, 1976, they were no longer paying for her gas, hot water and electricity. Plaintiff initiated the present action for permanent injunction and moved for preliminary injunction to have the services restored by the landlord. The Honorable Justice Abraham Multer, having heard the motion, directed that defendants restore the services, the tenant to pay $10 monthly for the use of hot water, and for her to arrange and provide for separate gas and electric meters to her apartment and pay all costs of installation until the present action is determined or until plaintiff vacates the premises. Thereafter, plaintiff moved to hold defendants in contempt but on May 3, 1976, withdrew the motion. Nothing further appears in the papers and no evidence was submitted at the trial on this phase of the matter. Plaintiff undoubtedly was satisfied to let the matter rest, but defendant landlords noticed the case for trial.
Plaintiff appeared at the trial without representation. Legal Aid, which had represented her on the prior proceedings, had been relieved by order of the court. In their motion papers to be relieved, the attorney for the Legal Aid Society stated that they were informed from information sent to them that plaintiff had substantial assets far in excess of the maximum permitted to be held by clients of the Legal Aid Society; that the attorney sent plaintiff a letter requesting information regarding her salary, bank balance and other assets. On July 29 and July 30, the attorney for Legal Aid spoke to the plaintiff who refused to disclose any of her financial data. Based on plaintiff’s refusal to supply information, the motion by the Legal Aid Society to withdraw as attorney for the plaintiff was granted by the court. The court at first adjourned the matter to allow plaintiff to obtain other counsel, but when she did not do so, it proceeded with the trial. The court offered plaintiff an opportunity to state her case. Her only response *483 was that she was entitled to occupy the apartment rent free because it was a statutorily illegal premises. No other testimony or evidence was offered in support of plaintiff’s case for permanent injunction, but in light of the decision herein on the counterclaim, the issues raised in plaintiff’s action become moot.
In way of clarification, at this point, we have a situation in which the landlords, who are in violation of the law because of the "illegality” of their basement apartment, cannot evict their tenant to remove the violation. They cannot obtain rent even at the reduced rental, as the tenant simply refuses to pay, and to add to the Kafkaesque situation, they are obligated to supply their unwanted "guest” with free gas, electricity and hot water. For six and one-half years this injustice has been perpetuated. The tenant has been tenacious both in her refusal to remove herself and in her refusal to pay rental for the apartment she occupies. The landlords are frustrated in their inability to register the premises as a multiple dwelling and thwarted by the inflexibility of statutory technicalities.
The law, as pertains to this instance, is punctilious, uncompromising and embarrassing in its result, most certainly, inconsistent with our preferred concepts of law as sagacious and venerable. Fortunately, the rigid confines of statutory law can, on appropriate occasion, be tempered with the more pliable remedies of equity.
I can think of no more appropriate occasion than the case before the bar. The underlying rationale of the appellate court, in refusing to evict, is not without merit. The technicality in the applicable sections of the New York City Administrative Code and the Multiple Dwelling Law were undoubtedly constructed to discourage landlords who would ignore building restrictions and offer an illegal apartment to an unsuspecting tenant. It further serves to penalize the owner as well as protect the tenant from eviction at the whim of the landlord. This positive intent has been distorted into a negative result. In the instant case, the landlords have been punished far in excess of the "crime.” The tenant has been so well protected that she has become unjustly enriched under the auspices of the law. Furthermore, the result contravenes the very purpose of the law, that is, to eliminate illegal apartments, and instead perpetuates the existence of this apartment occupied by the tenant on what appears to be a "permanent” basis. Equity
*484 may look to the intent of the law rather than to its form (2 Pomeroy’s Equity Jurisprudence [5th ed], § 360).
Plaintiffs position in this action may be plainly put as follows: "The apartment is illegal and the landlords can’t do a thing to make it legal. I don’t have to pay rent because I can’t be evicted and, as the landlords are obligated to provide me with services free of charge, I’ll stay on so long as it pleases me.” It is obvious by now that the tenant has no intention of giving up this profitable deal and is, therefore, willing to weather the storm of her landlords’ hostility and the inconvenience of court appearances.
It is also quite true that the defendants were initially at fault in offering and renting a third apartment in a two-family house. Still, this illegality, from which they have reaped little benefit, should not preclude them from seeking just and equitable remedy. "Equity does not demand that its suitors shall have led blameless lives.” (Loughran v Loughran, 292 US 216, 229 [Brandeis, J.].)
The courts have been unwilling to conform with the letter of the law if to do so would not only contradict the purpose of the statute but would eventuate an apparent injustice (Holy Trinity Church v United States, 143 US 457, 459; Williams v Williams, 23 NY2d 592, 599).
The equity court, in the interest of justice, has the power to eradicate a deplorable consequence brought about by strict adherence to ministerial technicalities. Accordingly, the court holds that the plaintiff shall vacate the premises which she now occupies at 303 Gates Avenue, Brooklyn, by January 15, 1978 and that the defendants shall not use the vacated apartment as a rental unit, but shall convert the premises into a two-family dwelling as required and directed by the Department of Buildings.
Defendants’ request for a money judgment is denied.