OPINION OF THE COURT
Margaret Taylor, J.
Respondent Harrison (the tenant) moves to dismiss this summary holdover proceeding. The court elected to treat the motion as a motion for summary judgment and so notified the parties in compliance with CPLR 3211 (subd [c]). The issues to be resolved are (1) whether the tenant has been residing in the premises sought to be recovered; (2) if so, whether petitioner (the landlord) acquiesced in that residence; (3) whether the premises sought to be recovered are subject to rent stabilization; and (4) whether the building is a multiple dwelling within the meaning of section D26-41.21 of the Administrative Code of the City of New York.
The landlord brought this petition in the Housing Part of this court, a part which deals solely with residential landlord-tenant summary proceedings.. Commercial landlord-tenant matters are brought in the non-Housing Part of Civil Court, Part 52.
In its notice of petition, the landlord prays for a final judgment of eviction against the tenant, awarding the landlord possession of premises: “Apartment No._on *507 the 2nd floor, consisting of all rooms in premises known as and located at 129 East 56th Street, 2nd FL, New York, New York.” (Emphasis supplied.) In its petition dated September 8, 1981 the landlord likewise describes the premises for which possession is sought as: “The all-room apartment at 129 East 56 Street, 2nd FI., New York, N.Y.” (Emphasis supplied.) The landlord also alleges that Leonard Harrison is the tenant of said premises.
In its opposition papers to the tenant’s motion to dismiss, the landlord now claims that the premises are commercial, rather than residential, and that the tenant can be evicted upon the proper service of a 30-day notice.
The tenant swears that, although he initially rented the premises for commercial purposes, he has resided in the premises since February, 1978 and that an employee of the landlord helped him move in. That employee agrees he helped the tenant move in but swears that he acted after his usual working hours and that he never told his employer about the help he gave the tenant. In addition, the tenant swears that on numerous occasions since February, 1978 he directly informed, among other principals or agents of the landlord, Mr. Stanley Weintraub, chairman of the board of the landlord that he was residing in the subject premises. Although this court afforded the landlord many opportunities to submit affidavits by persons with knowledge of the facts, the only evidence the landlord has submitted to contradict the tenant’s evidence and the landlord’s own notice of petition and petition is an affidavit by Mr. Fraser Brown, the landlord’s new manager. Mr. Brown states “upon information and belief” that Mr. Weintraub did not know that the tenant was residing in the premises. The court need not speculate as to why the landlord has failed to provide an affidavit by Mr. Weintraub to contradict the tenant’s claim that he informed Mr. Weintraub he was residing at the premises. With regard to the issue of the tenant’s residence in the subject premises and the landlord’s knowledge of, and acquiescence in, that residence, Mr. Brown’s hearsay statement cannot suffice to defeat the tenant’s allegation on a motion for summary judgment. (Siegel, New York Practice, p 337.) [1]
*508 The court, therefore, finds that the tenant is a combination commercial-residential tenant and that the landlord has acquiesced in that residence since approximately February, 1978. (See Lipkis v Pikus, 99 Misc 2d 518, affd 72 AD2d 697.)
The building’s certificate of occupancy, a copy of which has been submitted by the landlord, classifies the building as a multiple dwelling, class A. It is undisputed that, not counting the subject premises, the building contains five separate residential apartments. The tenant claims that his premises, being the. sixth residential premises in the building, is covered by rent stabilization. The landlord denies the premises are subject to rent stabilization.
The landlord asserts that the building contains five residential dwelling units and two commercial units, the latter including the premises occupied by the tenant. This assertion is consonant with the certificate of occupancy, but the tenant’s residence in the premises, though not in compliance with the certificate, suffices, together with the landlord’s acquiescence in that residential use, to make the tenant’s premises a de facto residential dwelling unit. (See, e.g., Mandel v Pitkowsky, 102 Misc 2d 478, affd 76 AD2d 807; Lipkus v Pikus, supra.) The building, therefore, has contained six residential units since 1978.
Subdivision a of section 3 of the Emergency Tenant Protection Act of 1974 (ETPA) (L 1974, ch 576) authorizes municipalities to declare that a housing emergency sufficient to require the regulation of residential rents exists with respect to “all or any class or classes of housing accommodations * * * heretofore or hereafter decontrolled, exempt, not subject to control, or exempted from regulation and control under the provisions of the emergency housing rent control law, the local emergency housing rent control act or the New York City rent stabilization law of nineteen hundred sixty-nine; or subject to stabilization or control under such rent stabilization law”.
*509 Pursuant to section 3 of the ETPA, the New York City Council resolved that a state of emergency existed which required controls on, inter alia, “all classes of housing accommodations within the City of New York including, but not limited to, housing accommodations heretofore destabilized, heretofore or hereafter decontrolled, exempt, not subject to control or exempted from regulation or control under the provisions of the local Emergency Housing Rent Control Law or the City Rent Stabilization Law.” (Resolution No. 276, June 4, 1974.)
Subdivision c of section 4, subdivision c of section 6, subdivision b of section 7, subdivision c of section 8, subdivision e of section 9, subdivision b of section 10, and subdivision b of section 12 of the ETPA provide that in a city of one million or more, i.e., in New York City, the ETPA is to be implemented by the administrative apparatus provided for by the Rent Stabilization Law of 1969 (Administrative Code, ch 51, tit YY).
Subdivision a of section 5 of the ETPA provides that (except for certain specifically listed exemptions discussed infra) “A declaration of emergency may be made pursuant to section three as to all or any class or classes of housing accommodations in a municipality”. Thus, while the administrative apparatus and the rental levels established pursuant to the Rent Stabilization Law of 1969 are to implement the ETPA in New York City, the range of housing to which the ETPA applies in New York City is defined exclusively by section 5 of the ETPA and by city council Resolution No. 276 passed pursuant to section 3 of the ETPA.
According to its certificate of occupancy, the building which includes the premises here sought to be recovered was completed in 1938. It was, therefore, not subject to rent stabilization prior to implementation of the ETPA. (See Administrative Code, § YY51-3.0, subd a, par [1].) However, by virtue of Resolution No. 276 of the city council and subdivision b of section YY51-3.0 of the Administrative Code, residential dwelling units in the building are now subject to rent stabilization unless specifically exempted by section 5 of the ETPA.
*510 The only arguably applicable exemption is section 5 (subd a, par [4]) of the ETPA which provides that a municipal declaration of emergency may not be made as to “housing accommodations in a building containing fewer than six dwelling units other than [an exception not here relevant].”
Since the building contains six dwelling units, the exemption of section 5 (subd a, par [4]) does not on its face apply. In a recent case, however, a well-respected Judge in the housing court held that where a building contains only five dwelling units on July 1,1974, the effective date of the ETPA, and a sixth unit is thereafter created, the six units are not subject to rent stabilization. (123 East 18th St. Corp. v Gisler, 113 Misc 2d 718.) This court disagrees.
As the Gisler court stated (p 723), the requirement that a building contain at least six dwelling units for the ETPA to apply bespeaks the legislative purpose of excluding “small buildings from the rent stabilization umbrella”. It is indisputable that had all seven units in the instant petitioner’s building been occupied as residences in 1973, they would all have been made subject to rent stabilization by the ETPA in 1974. The size of the building is not affected by the fact that respondent moved into his apartment in 1978 rather than in 1973. To be sure, it is not simply the physical dimensions of a building that determine whether the ETPA may apply to it but rather the number of dwelling units which it contains. The purpose of the ETPA is to prevent speculation and rent gouging. (ETPA, § 2.) Presumably, the Legislature set the minimum number of units at a point below which the marginal expense of administering the act could be assumed not to be outweighed by the extent of the opportunity for rent gouging. The Legislature set that number, perhaps somewhat arbitrarily, at six. When a building contains six dwelling units it is not excluded by section 5 (subd a, par [4]).
Nowhere in the ETPA is there an indication that the act is to apply if the conditions under which it applies are met within a building in 1973 but not if these conditions are first met after July 1, 1974. There are, indeed, strong indications to the contrary.
*511 Subdivision a of section 3 of the ETPA explicitly provides that the act may apply to housing accommodations “heretofore or hereafter” not otherwise subject to control. This language is repeated in the implementing resolution passed by the city council (op. cit.). Both section 3 of the ETPA and the city council resolution passed pursuant thereto explicitly anticipate that the legal situation of particular housing accommodations will change in the future and provide that the ETPA will apply to those accommodations when they first meet the conditions in which the act applies. It would be anomalous to read the exemptions provided in section 5 in a contrary spirit and to assume without any basis in the legislative text or in legislative history that they are intended to apply only once and for all, regardless of changes in housing accommodations subsequent to 1974.
Indeed, the exemption for “buildings completed * * * as family units * * * after” January 1, 1974 provided for in section 5 (subd a, par [5]) would be mere surplusage if paragraph (5) is interpreted to provide that if a building contains fewer than six dwelling units on the effective date of the ETPA but six or more at a subsequent time then all units in the building are forever exempted. By definition, if a building has not been completed by January 1, 1974, it cannot already contain six units at that time.
Further, section 5 (subd a, par [5]) also explicitly provides for premises to which the ETPA applies at one timé to be exempted at a subsequent time if certain conditions are met, viz., if the building is “substantially rehabilitated as family units” after January 1,1974. (See this court’s opn in Hickey v Bomark Fabrics, 111 Misc 2d 812; Goodman v Ramirez, 100 Misc 2d 881.)
Paragraph (6) of subdivision a exempts “housing accommodations owned or operated by * * * any institution operated exclusively for charitable or educational purposes”. Like paragraph (4), and unlike paragraph (5), this exemption does not explicitly anticipate a change in the status of buildings. Nonetheless, when a tenant argued that a building is exempt only if it was already owned by a nonprofit entity on the effective date of the ETPA, the Appellate Term unanimously rejected his view: “No such *512 limitation appears in the statute’s language and we cannot supply such an omission, if omission there was, by construction. A statute is to be read and given effect as written and the courts under the guise of interpretation may not change the scope of a legislative enactment (Weinberg v DM Rest. Corp., 53 NY2d 499, 508). We see no basis in the wording of the exemption for a distinction to be drawn between qualifying institutions in possession as of May 29, 1974 and institutions which were purchased subsequent to that date.” (Museum of Modern Art v Kirk, 111 Misc 2d 1074, 1076 [App Term, First Dept].)
Similarly, when a sixth residential unit is added after the effective date of the act, all six units become subject to the act exactly as they would have been had the sixth unit been in existence in 1973 — unless the addition of a sixth (or subsequent) unit is part of a substantial rehabilitation of the building within the meaning of section 5 (subd a, par [5]).
Where there are six or more residential units in a building on the effective date of the FTP A but they are subsequently reduced to fewer than six, the remaining units continue to be stabilized. (CAB Opns Nos. 7590, 7591, 7933, 18257; see 123 East 18th St. Corp. v Gisler, supra.) This is to prevent landlords in marginal situations from reducing the number of residential units in their buildings so as to escape rent stabilization. A reduction in dwelling units would be directly contrary to the purpose of the act and, therefore, it may not serve to shield a building from coverage by the act. The corresponding legislative purpose that would be fostered if a post-1974 addition of a sixth dwelling unit did not bring all six units under rent stabilization would be to encourage the creation of new units. But here the Legislature struck a balance. If a new building is erected, then apartments within it are not stabilized. Further, if an existing building with six or more dwelling units is rehabilitated to a sufficient degree as family units then not only are the newly created residences not subject to rent stabilization, but also the pre-existing units are taken out from under stabilization. (Goodman v Ramirez, supra.) A creation of new units not sufficient to *513 bring paragraph (5) into play, however, does not create an exemption.
Thus, the court finds that respondent occupies his apartment as a residence with the acquiescence of the petitioner, that the building in which the apartment is located is a multiple dwelling and that the apartment is subject to rent stabilization.[2]
The petition is therefore dismissed.

. Landlord’s attorney refers to a complaint the tenant made to the Commission of Human Rights in which he claimed the landlord was trying to evict him from his *508 “commercial space” because he was a black businessman. The court notes, however, that consistent with his position in this matter, the tenant stated not only that he used the premises for commercial purposes as a black businessman, but also that he resided at 129 East 56th Street, Parlor Floor, the same premises which are the subject of the instant proceeding. Nowhere does the tenant dispute that he uses the premises for both commercial and residential purposes.

. In view of the above disposition, it is unnecessary for the court to deal with the question of whether the petition can be amended at this time to allege the multiple dwelling status of the building and its multiple registration number as required by 22 NYCRR 2900.21 (f).