OPINION OF THE COURT
Leonard N. Cohen, J.
These nonpayment summary proceedings illustrate the unregulated twilight zone of commercial loft conversions for residential reuse in our city, resulting in widespread illegality, absence of housing code enforcement, hazards to health and safety, owner abuses and manipulation of tenants, and housing law confusion.
These proceedings involve tenant artists whom the State Legislature, in enacting article 7-B of the Multiple Dwelling Law on August 11, 1977, (entitled "Joint Living-Work Quarters for Artists, or General Residential Occupancy of Loft, Commerical, or Manufacturing Buildings”), recognized as a protected class of persons who enhance our city’s cultural life, *585 but have limited financial resources and require large amounts of space at low rentals to pursue their artistic endeavors. Well-intentioned legislative purposes however, often remain unfulfilled. Building code requirements which permit conversion of commercial space for residential reuse, both generally and for artistic specifically, are less stringent for public health and safety than established local housing codes for residential dwellings.
The New York City Department of City Planning in December, 1977 issued a report entitled, "Residential Re-use of Non Residential Buildings in Manhattan” (hereinafter referred to as the Report) which pointed out that commercial loft "conversion activities are largely unregulated, taking place outside the City’s established policy and enforcement framework.” (See, also, "Report of Mayor’s Task Force on Loft Conversions”, Sept. 11, 1978.) The Report further states that such an "ad hoc unregulated conversion process” raises "important policy concerns” including "the impact of a strong residential demand on space occupied at present by business uses” and "potential hazard and liability to the public”. The Report continues, "of the nearly 1,000 buildings having three or more occupied housing units, identified by the study, only 87, less than ten percent, have valid certificates of occupancy for residential use.”
In addition to article 7-B conversions, two-family living-work artist-in-residence (AIR) conversions in commercial loft buildings are permitted in designated zoned districts. The statutory source for AIR conversions is unclear, if existent at all. AIR occupancies are not protected by rent control, effective code enforcement, the Multiple Dwelling Law, or the New York City Administrative Code. Without distinguishing between AIR occupancies and multiple dwelling conversions under article 7-B, the Reports states that in Tribeca (Triangle Below Canal Street), the area involved in these proceedings, of the total of 224 commercial loft buildings conversions, 97.7% were illegal.
The Report recognizes as a major problem the fact that since these converted residential lofts do not have proper certificates of occupancy, the tenants are considered illegal occupants subject to the threat of eviction. This threat, "coupled with the large investment of the tenants in the fixtures” can be used by the owner "to manipulate tenants to obtain unreasonable rent increases or building improvements which *586 are inherited by the owner after a tenant leaves or is evicted.” It is in this context that the joint trial of these proceedings was conducted.
The petitioner is the owner of four commercially zoned buildings with commercial certificates of occupancy, at 47, 49 and 55 Walker Street and 71 Franklin Street, Manhattan. He commenced commercial nonpayment summary proceedings in October, 1977 against eight rent withholding artist living-work loft tenants.
These proceedings appeared on this court’s Commercial Landlord and Tenant Calendar in February, 1978, resulting in a protracted joint trial. One proceeding (Lipkis v Manly, L&T Index No. 102261/77) involving 71 Franklin Street was dismissed during trial for lack of proof of petitioner’s ownership, it having been conclusively shown that the title owner was the City of New York as the result of a tax foreclosure order. (App dsmd NYLJ, Sept. 29, 1978, p 4, col 1.) The rents sued for in the balance of the petitions as amended, cover the period from October, 1977 through April, 1978 except as to the Pikus petition which demands rent from September, 1977 and was amended to include the period through June, 1978. Substantial rents have been deposited in court or held in escrow with the respondents’ attorney. Counterclaims by the Pikuses, Manly and Kilvert were severed on consent.
The background of these proceedings is as follows.
Three tenants (Pikus, Gordy, Strouchler) entered into leases for terms of two years. Two tenants (Kilvert, Perlstein) occupied under a one-year lease, one tenant’s lease (Childress) had a term of one year and four months and one (Girone) was a month-to-month tenant under an oral agreement. Rents ranged from $400 to $500 monthly. All tenants have been certified by the New York City Department of Cultural Affairs as artists under city standards. All except two of the tenants learned of the availablity of their lofts from advertisements, one tenant (Pikus) learned of his loft from an ad placed by petitioner as a living-work loft. Other ads were placed by prior tenants. Each tenant paid from $2,000 to $5,500 to prior tenants as "fixture or key” money except the Pikuses, who made their own extensive capital improvements. The owner invested nothing in the capital improvements of any of the loft premises. With the exception of the Pikuses, the tenants moved into premises which were substantially habitable, the major alterations and conversions having been done by prior *587 occupants, but all the respondents expended money and "sweat” labor to further improve their lofts.
With the exception of the one month-to-month tenant, the respondents originally occupied their lofts pursuant to written standard form commercial leases, prepared by the owner, providing for use as an "artist studio and for no other purpose”. Heat was to be provided by the owner only for business days and hours and the sole responsibility and cost for repairs and alterations was imposed on the tenants as was compliance with city and State laws. The tenants were required to furnish and pay for their hot water, gas and electricity.
The respondents in withholding rent, commencing September 7, 1977 and precipitating these proceedings, deny liability and seek dismissal on the grounds that the buildings were willingly and knowingly permitted by the owner to be converted into de facto multiple dwellings and concededly, as each lacks a multiple dwelling registration number and residential certificate of occupancy, the owner is thereby prohibited from commencing these commercial proceedings as jurisdictionally defective and barred from collecting rent through the last month for which rent is sought herein. The respondents further seek money damages for alleged fraud in the execution of the rental agreements and counterclaim for breaches of the implied warranty of habitability. Two of the respondents, in conforming pleadings to the proof, also claim damages for rent gouging.
The petitioner denies rent gouging and any fraudulent conduct in the execution of the six written leases and the one oral agreement involved and alleges the buildings are neither multiple dwellings nor knowingly and consensually converted by him into multiple dwellings. He contends the commercial buildings are legally permissible AIR lofts and thereby shielded from compliance with Multiple Dwelling Law requirements and excluded from the mandate of the implied warranty of habitability under section 235-b of the Real Property Law. The petitioner further contends any interior structural alterations, conversions, repairs or illegal uses were created solely by the tenants at their peril and within their sole responsibility under their leases. Petitioner asserts his failure to obtain a multiple dwelling registration number or residential certificate of occupancy, even if required, was a mere technicality and in any event, sufficient proof was shown of substantial compliance with the Multiple Dwelling Law, *588 thereby, relieving him of the statutory barrier to the collection of rents in the absence of an appropriate certificate of occupancy.
The first crucial question to be determined is whether 49 and 55 Walker Street constituted multiple dwellings for the period covered by these proceedings. (The court will consider 47 Walker Street separately because of the variation in the fact pattern with regard to that building. However, the general principles discussed herein apply to 47 Walker Street as well.) If it is determined that the premises are multiple dwellings, then the court must next consider the owner’s assertion that the tenants converted the buildings into multiple dwellings without his willing or knowing consent. If such contention is rejected, then the remaining issues are: whether there was compliance with the laws regulating multiple dwellings; who is responsible for compliance; and the legal consequences, if any, for failure to comply with the law.
Subdivision 7 of section 4 of the Multiple Dwelling Law defines a multiple dwelling, in part, as "a dwelling which is either rented, leased, let or hired out, to be occupied, or is occupied as the residence or home of three or more families living independently of one another.”
Subdivision 7 of section 4 of the Multiple Dwelling Law further defined by subdivision 1 of section 4 of the Multiple Dwelling Law which states that "Whenever the word or words ’occupied,’ ’is occupied,’ ’used’ or ’is used’ appear, such word or words shall be construed as if followed by the words ’or is intended, arranged or designed to be used or occupied.’ ”
Thus, the statutory definition of a multiple dwelling includes not only actual existing use by the intended use or design. (Glatzer v Malkenson, NYLJ, Aug. 31, 1976, p 10, col 4; Lubrano v Fried, NYLJ, May 17, 1977, p 11, col 2.) The petitioner has the burden of proof to show that the buildings are not multiple dwellings as alleged in his petition. (Finkelstein v Reyes, 75 Misc 2d 340.)
After trial the owner failed to sustain his burden of proof that these buildings were not multiple dwellings as alleged in his petitions. The preponderance of the credible evidence established that the buildings were actually occupied and were intended to be occupied, physically arranged and designed as residences for three or more families living independently of one another.
Notwithstanding the commercial rental agreements, the *589 proof showed that the interior space of both 49 and 55 Walker Street was designed for living and arranged to accommodate three individual families (in 55 Walker: Gordy, Girone, Strouchler, and in 49 Walker: Kilvert, Childress and Perl-stein). The owner himself conceded that he told each tenant upon signing leases that they could "live and work there.” In fact, five separate written leases and one oral month-to-month agreement were entered into for three separate families to reside and work in each of these two buildings.
Significantly, the owner obtained, while the trial was still pending, a multiple dwelling registration number for 49 and 55 Walker Street on May 3, 1978 and on May 5, 1978 without performing any repairs or renovations. This appears to be an implied admission by the owner of the multiple dwelling status of these two buildings.
The owner’s contention that these premises were legally permissible AIR occupancies and not multiple dwellings must be rejected. AIR status only applies to commercial buildings housing one or two artists living independently of one another. In 49 and 55 Walker Street there are three artists living independently in each building. Thus, the AIR status does not apply.
The owner’s assertion that he did not consent to the conversion of these buildings is not supported by the evidence. Not only did he tell three families that they could reside in each buidling, he was in complete personal control of every aspect of operation, supervision and management of all three buildings. He maintained his office in one; he supervised and arranged for common area repairs; he collected rents; prepared, negotiated and signed all leases and set their terms; complaints were referred to him; he acted as the superintendent; he managed the buildings; he authorized sublets; he collected cash fees from vacating tenants and personally exercised control over tenant accelerated lease termination and he approved all new tenants; he had knowledge of the fixture fees the incoming tenants paid; he was fully aware of all residential conversions, alterations, repairs and rehabilitation by tenants in each loft; he encouraged tenants to renovate and make residential improvements to their loft space at their sole cost and expense; he observed and encouraged tenant subdivisions, partitions, and installation of new kitchens, bathrooms and gas heating; he was the general contractor for the buildings for necessary owner repairs; and he knew of all the *590 tenant family needs for living accommodations as he visited their premises during and subsequent to their improvements. There is no doubt that the owner had full knowledge of the nature of the tenancies in these buildings and that he encouraged the tenants to use the premises as residences. Under these circumstances, he cannot argue that the commercial lease is controlling. The owner by his conduct in effect modified the terms and conditions of the commercial leases. (Nationwide Record Stor. v Greenberg, Index Nos. 53107-53112, Civ Ct, NY County, July, 1978.)
Unlike the cases cited by the petitioner in his brief, Tarkington Assoc. v Spilner, (NYLJ, June 8, 1978, p 10, col 3), Tarkington Assoc. v Koslin (NYLJ, June 8, 1978, p 10, col 3), McClelland v Robinson (94 Misc 2d 308), the facts established herein that these tenants moved into premises that were substantially habitable. They did not rent raw space but leased lofts, although unconventional in design, already converted for living. The owner here has reaped the benefit of the prior tenants’ capital improvement of his buildings which allowed him to subsequently lease these premises as spearate renovated living-work lofts. He cannot now claim under these facts that the tenants are estopped from asserting the protection of the Multiple Dwelling Law and the New York City Administrative Code. The owner was a consenting active participant in the multiple dwelling conversions. Unlike Mc-Clelland v Robinson (supra) and Tarkington Assoc. v Spilner (supra), the tenants here did not by their own hands confer residential status upon themselves. It was the prior tenants who converted the premises with the owner’s consent and it was the owner who offered the renovated premises to these respondents for occupancy as multiple dwellings.
The next issue to be determined involves compliance with the law regulating multiple dwellings. It is clear that the law requires multiple dwellings to have a multiple dwelling registration number and a residential certificate of occupancy. Subdivision 2 of section 301 of the Multiple Dwelling Law states in part that: “no dwelling constructed as or altered or converted into a multiple dwelling * * * shall be occupied in whole or in part until the issuance of a certificate of compliance or occupancy.”
Subdivision b of section D26-41.01 of the Administrative Code of the City of New York in part requires that: “A registration statement shall be filed: (1) for every existing *591 multiple dwelling. (2) prior to the issuance of a certificate of occupancy for * * * any dwelling or building hereafter altered or converted to a multiple dwelling.” It is conceded that at the commencement of these proceedings the owner had neither a multiple dwelling registration number nor a multiple dwelling certificate of occupancy.
The penalties imposed for failure to comply with the foregoing statutes are embodied in the following. Section 302 of the Multiple Dwelling Law entitled "Unlawful occupation” provides in relevant part: "1. a. If any dwelling or structure be occupied in whole or in part for human habitation in violation of section [301], during such unlawful occupation * * * b. No rent shall be recovered by the owner of such premises for said period, and no action or special proceeding shall be maintained therefor, or for possession of said premises for nonpayment of such rent.”
Subdivision 2 of section 325 of the Multiple Dwelling Law provides that: "In any city over one million which, by local law, requires the registration of owners of multiple dwellings and which prescribes penalties, remedies, and sanctions to be imposed for the violation of such local registration requirements, no rent shall be recovered by the owner of a multiple dwelling who fails to comply with such registration requirements until he complies with such requirements.”
Subdivision b of section D26-41.21 states that: "An owner who is required to file a statement of registration under this article and who fails to file as required shall be denied the right to recover possession of the premises for non-payment of rent during the period of non-compliance, and shall, in the discretion of the court, suffer a stay of proceedings to recover rents, during such period.”
The owner cannot, as he has attempted to do, place the onus of complying with these registration and certificate of occupancy statutes upon the tenants. The law unequivocally mandates that as the owner’s obligation. Section 300 (subd 1, par a) of the Multiple Dwelling Law states in part that: "The owner, or a registered architect or licensed professional engineer designated by the owner as his agent, shall file with the department * * * the specifications for the * * * conversion”.
Subdivision a of section D26-41.01 of the Administrative Code states that: "The owner of a dwelling required to register under this article shall register with the department in accordance with the provisions of this article.”
*592 The owner argues that the tenants failed to file plans for the alteration of their premises with the appropriate housing authority in breach of their leases which provided for tenant compliance with city and State law. But the alterations made by the respondents in 49 and 55 Walker Street are of no consequence here for the conversion to residential premises was made by prior tenants. The assertion that these respondents, by not registering the buildings or obtaining a proper certificate of occupancy violated their rental agreements is untenable. The explicit language of the statutes cited above place this obligation on the owner. The owner cannot avoid this requirement by lease or otherwise. Only the persons specifically provided by statute have the requisite information or the ability to gather the data necessary to comply with the Multiple Dwelling Law and the Adminstrative Code.
Nor can the owner circumvent the penalty for failure to comply by asserting that substantial compliance with the intent and thrust of the law is all that is required. That, in effect, failure to comply is a mere technicality if the building is safe and habitable. The cases cited by the petitioner in this regard are clearly distinguishable from the case at bar. In Washington Sq. Professional Bldg. v Leader (68 Misc 2d 72) and Stanley Assoc. v Marrero (87 Misc 2d 1011), the tenants, legal occupants under an existing certificate of occupancy, attempted to assert the defense of section 302 of the Multiple Dwelling Law based on the illegal occupancy of another tenant. In Chatsworth 72nd St. Corp. v Rigai (71 Misc 2d 647, affd 43 AD2d 685, affd 35 NY2d 984), it was conceded that the landlord had attempted to obtain a proper certificate of occupancy for several years, that in fact, a temporary certificate of occupancy had been issued and that the tenant, by his own actions and in contravention of a prior order of the Rent Commissioner, had blocked the issuance of the certificate of occupancy. The owner in Lazarus v Liebowitz (85 Misc 2d 822) had registered the building as a multiple dwelling but the tenant contended that he had failed to properly list all the record owners of the building. Finally, in Corbin v Harris (92 Misc 2d 480) the Supreme Court, relying upon its equitable powers, held that the tenant in an illegal apartment must vacate the premises and the landlord could no longer use the vacated apartment as a rental unit in violation of the building’s certificate of occupancy as a two-family dwelling. Despite the extraordinary circumstnces of that case, rent demanded by the owner was denied.
*593 All the cases distinguished above involve properties held out as residential units where the tenants presumably received the benefits flowing from the occupancy of a residential dwelling including but not limited to heat, sanitation, and rent regulation statutes. In the case at bar, the petitioner contends these buildings are commercial buildings with permissible AIR occupancies and that substantial compliance with the external structual safety requirements of article 7-B of the Multiple Dwelling Law and local housing codes, relieves him of the penalties imposed for failing to comply with sections 301 and 325 of the Multiple Dwelling Law and section D2641.01 of the Administrative Code. However, the respondents have not had the legal benefits of multiple dwelling status and their occupancy, in violation of the commercial certificate of occupancy makes them subject to eviction at any time. The Multiple Dwelling Law and the Administrative Code were designed to "discourage landlords who would ignore building restrictions and offer an illegal apartment to an unsuspecting tenant. It further serves to penalize the owner as well as protect the tenant from eviction at the whim of the landlord.” (Corbin v Harris, supra, p 483.) Accepting the petitioner’s argument would result in owners circumventing the statutory scheme regulating multiple dwellings and render meaningless the public purposes of the protective framework of housing safety, health and land use laws.
The petitioner implicitly argues that sections 302 and 325 of the Multiple Dwelling Law and section D26-41.21 of the Administrative Code are so harsh that they should not be enforced when substantial compliance is shown. However, those statutes are punitive in order to put teeth in the public policy embodied in these laws and thereby ensure compliance. Courts have not hesitated to impose these sanctions. (Schwartzkopf v Buccafusa, 98 NYS2d 42; Carmel v Appleton, 127 NYS2d 268; Mintz v Robinson, 81 Misc 2d 447; Baum Residence Corp. v Van Rosson, 206 Misc 314; Guarino v Timares, 196 Misc 414, mot for lv to app den 276 App Div 842; Finkelstein v Reyes, 75 Misc 2d 340, supra; Waters v Panzella, 100 NYS2d 214; Lebron v Cusimano, NYLJ, Jan. 18, 1978, p 10, col 1; Silmar Estates v Bien, 165 Misc 239.)
Petitioner in his brief urges that the denial of access to the loft space by the tenants, preventing the owner from legalizing the multiple dwelling status of 49 and 55 Walker Street, is a reason for not imposing the statutory penalties. This argue *594 ment is without merit. Access or lack of it was neither pleaded nor litigated in these proceedings. His trial theory throughout these proceedings was a denial of multiple dwelling status for all buildings. Nevertheless the proof showed the owner obtained a multiple dwelling registration number for 49 and 55 Walker Street near the close of the trial without the necessity of owner access to any of the lofts in either of the two buildings. As for 47 Walker Street, the owner has never sought to obtain a multiple dwelling registration number or residential certificate of occupancy for this building.
In summary, the petitioner herein alleges that 49 and 55 Walker Street are not multiple dwellings. Petitioner has failed to sustain his burden of proof in this regard. In fact, the preponderance of the credible evidence established that the owner consented to such residential loft conversion. Therefore, the holding of this court rests upon a fatal defect in the petitioner’s proof as adduced at trial and not necessarily, as respondents contend, on a finding of a defect in the pleadings. (Rosgro Realty Co. v Braynen, 70 Misc 2d 808.) Nevertheless, it is undisputed that petitioner failed to comply with section 325 of the Multiple Dwelling Law and section D26-41.21 of the Administrative Code, requiring the registration of a multiple dwelling for the period covered in these proceedings. Accordingly, the petitions are dismissed and the sanctions provided in these statutes preventing the collection of rent and the recovery of possession of the premises are hereby invoked.
Furthermore, under section 302 (subd 1, par b) of the Multiple Dwelling Law, the owner herein is barred from the recovery of rent or the regaining of possession for the period covered by these amended petitions during which time these multiple dwellings were occupied in violation of section 301 of the Multiple Dwelling Law requiring a residential certificate of occupancy. (Schwartzkopf v Buccafusa, supra; Carmel v Appleton, supra; Baum Residence Corp. v Van Rosson, supra; Guarino v Timares, supra.)
Turning to 47 Walker Street, involving respondents Mario and Rebecca Pikus, tenants under a two-year lease for the entire fifth floor space commencing July 1, 1975 at a monthly rental of $500, the fair preponderance of the credible evidence showed the following.
When the Pikuses signed their lease for the fifth floor, the building was already occuied by the two other artist tenants (Bailey and Snyder). Bailey had leased the second floor and *595 with the owner’s consent and permission, subdivided the premises and sublet a separately arranged living loft to Snyder. Both Bailey and Snyder occupied the second floor until the expiration of the lease in June, 1977.
The owner then sought to lease either the north or south side of the second floor to Hawley, who entered into a lease for the south side on July 1, 1977. At the same time, the owner leased the north side to Beesley, who lived there for one or two nights. It is clear from the owner’s conduct, the signing of leases with both Hawley and Beesley, that he intended the second floor to be arranged and designed for living for two independent families. Therefore, Bailey’s advertisement for a floor-through on the second floor is irrelevant to the owner’s intentions regarding the occupancy of the floor.
After Beesley vacated, later in September, 1977, the north side of the second floor was rented as commercial space. However, the multiple dwelling character and design of this building was unchanged by this subsequent occupancy, as current usage is not necessarily, in and of itself, determinative of the multiple dwelling character and the owner’s intention therefor. (Pantekas v Westyard Corp., 44 AD2d 789; Rosario v Koss, 26 AD2d 561, mod 26 AD2d 590; Feneis v Lewin, 185 App Div 41.)
Despite the commercial tenancy, the building was continuously occupied from July, 1975 to September, 1975 by at least three independent families (Pikus, Bailey, Snyder). In September, 1975, the Pikuses renovated, altered and sublet a portion of the fifth floor to Kirk, with the owner’s permission, knowledge, encouragement and active paticipation. From September, 1975 through June, 1977, there were four families living in 47 Walker Street (Pikus, Bailey, Snyder, Kirk). From July, 1977 to date, three families have resided there (Pikus, Hawley, Kirk [replaced by Houis in Sept., 1977]).
The owner by his active participation in the subdivision of his property and his unconditional approval and encouragement of the subtenancies ratified and accepted the living arrangements which converted this building into a multiple dwelling. The owner in 1975 showed the Pikuses the second floor subdivision as a model for the fifth floor. Further, the owner showed the Pikuses his own architect’s plans for the fifth floor to assist the Pikuses in their subdivision. The owner was at all times aware of the Pikuses’ actual alterations. When Kirk, the subtenant, moved in during September, 1975, *596 the owner visited the premises, observed the subdivision and acknowledged the tenancy.
Therefore, at all times during and for two years prior to the pendency of this proceeding, 47 Walker Street has been arranged and designed as a multiple dwelling. (The court by visiting the premises during trial confirmed by observation the physical arrangement of the premises.) During this entire period, the building has been occupied by at least three families living independently of one another. The fact that only two commercial leases were signed is not controlling because the owner, by his own active, participatory conduct, ratified and approved the occupancies and is thereby estopped from denying the conversion to a multiple dwelling.
The building department violation, dated August 31, 1977, placed on 47 Walker Street for illegal residential use, was introduced by the owner as evidence of the Pikuses’ illegal occupancy, breach of their lease and as evidence of the owner’s intentions as to the nonmultiple dwelling status of the building. The owner argues that the Pikuses cannot rely upon their fifth floor subtenancy to establish the multiple dwelling character of the building as such occuancy is illegal. However, the violation relied upon relates to any residential occupancy in the building not just the subtenancy.
The petitioner neither sought removal of any of the residents of this building nor termination of the Pikus or Hawley leases for a breach thereof due to illegal occupancy. Ironically, it was not until September 15, 1977 that the owner selectively notified only the Pikuses of this building violation, one week after they alone withheld rent and merely informed them of the illegality of their sublet.
Rather than proceeding against the Pikuses or any of the other residential occupants in order to cure the violation, the owner in October, 1977 commenced this nonpayment proceeding against only the Pikuses, thereby confirming the continuity of the owner-tenant relationship and the subtenancy, which this court has hereinabove found to be knowingly and willingly consented to by the owner. Under these circumstances, the violation is not proof of the nonmultiple dwelling status of this building.
An additional element of proof which also is determinative is that 47-49 Walker Street constituted a single building. Both structures were conveyed in a single deed. Heat, mail and elevator services are provided by 47 Walker Street to both *597 buildings. The New York City Tax Department consolidated both buildings into a single tax lot in 1968. Since both constituted a single building, it is conclusive that more than three families are living independently of one another as defined by law.
Based on the facts and law, 47 Walker Street is a multiple dwelling knowingly and willingly created by the owner, subject to the same legal consequences as 49 and 55 Walker Street, warranting dismissal of the petition and barring the collection of rent through June, 1978 in this proceeding.
With respect to the affirmative defenses in each of the proceedings alleging that the owner breached the implied warranty of habitability under section 235-b of the Real Property Law, it would appear that liability attaches by virtue of the de facto multiple dwellings status but proof was insufficient to establish damages beyond the rent withheld and now unrecoverable by the owner. To attempt assessment on the record herein would be a futile speculative exercise. Furthermore, the penalty nature of the forfeiture of rent adequately compensates the tenants for damages during their occupancy which might be established on any severed assessment hearing.
The rent gouging allegation by Kilvert and Girone was primarily based on their testimony and evidence that as incoming tenants, Kilvert was compelled by the owner to pay him $500 cash for "good will” money and Girone was compelled by the owner to pay him directly $150 and to pay $350 to the vacating tenant as a "fee” for his lease.
The owner conceded he required a fee from outgoing tenants, either in consideration, as he claimed, for authorization of the acceleration of the lease termination of the outgoing tenant or for not increasing the new tenant’s rent to a level greater than ultimately agreed to.
Section 180.55 of the Penal Law provides: "A person is guilty of rent gouging when, in connection with the leasing, rental or use of real property, he solicits, accepts or agrees to accept from a person some consideration of value, in addition to lawful rental and other lawful charges, upon an agreement or understanding that the furnishing of such consideration will increase the possibility that some person may obtain the lease, rental or use of such property, or that failure to furnish it will decrease the possibility that some person may obtain the same.”
*598 Conduct which is punishable under the Penal Law may be made the basis for a civil action if damage may reasonably be assumed to flow from such conduct. (34 Hillside Realty Corp. v Norton, 198 Misc 302.) It is noted, however, that neither of these tenants proceeded criminally against the owner. The court finds from all the evidence that insufficient proof was established to sustain these claims and judgment is in favor of the petitioner in this regard.
It must be emphasized that resolution of all the issues in these proceedings depends to a large extent upon the credibility of the witnesses and the weight to be given to the testimony. In this regard, the record is replete with petitioner’s evasive, forgetful and equivocal testimony on material issues. Moreover, in the dismissed proceeding, • the court finds the petitioner was untruthful as to his unequivocal denial of bribing a building inspector. He later withdrew this denial and admitted the bribery which was subsequently revealed as the subject of a special city investigation with a legally tape-recorded conversation of the bribery. Moreover, the court finds the petitioner’s description of this criminal act was at variance with the special investigator’s testimony and therefore, petitioner’s testimony was either untruthful or at the most of dubious quality. The petitioner therefore, was not the innocent sheared lamb, beguiled by greedy tenants with a "hot commodity” as his attorney contends.
The owner’s conduct may have fallen short of fraud at the inception of the occupancies as the artist tenants may not have exercised a sufficinet degree of reasonable diligence to ascertain their rights and risks when signing commercial leases, paying substantial fixture costs to outgoing tenants and in occupying and performing additional alterations at their own expense. But the owner under all the circumstances clearly exhibited bad faith in failing to comply with the law and in lulling the tenants into the belief that they could live and work in these premises lawfully.
The counterclaims by Pikus, Manly and Kilvert, having been severed on consent, are hereby directed to be transferred to the Housing Part 49 of this court for trial and final disposition.
In accordance with the foregoing, final judgment is in favor of all the respondents dismissing all of the proceedings.
The parties, having litigated the merits of all the legal consequences raised in these proceedings, the owner is barred *599 from the collection of rents from Gordy, Perlstein, Strouchler, Girone, Kilvert and Childress due through April, 1978 and from the Pikuses through June, 1978.
The affirmative defenses and counterclaims for breach of warranty of habitability and fraud as to all respondents and rent gouging as to Kilvert and Girone are dismissed in accordance with the foregoing.
The rents deposited are directed to be refunded to the respective tenants upon submission of appropriate papers by the respondents’ attorney, including a schedule of rents deposited indicating the following: The tenant, the amount deposited with the court or held in escrow by the respondents’ attorney, and the rental period covered. Said schedule shall be served on notice and filed with the court five days after entry of final judgments.
A 10-day stay of entry of final judgment for each proceeding is granted.