OPINION OF THE COURT
Lester Evens, J.
In these actions, remanded to the Civil Court, New York County, for disposition by memorandum and order of the Appellate Division, First Department, entered on November 1, 1982, six respondent tenants move by order to show cause to vacate the final judgments of possession entered in favor of the petitioner landlord and to set aside the warrants of eviction issued simultaneously therewith on January 22, 1982, on the grounds that they are entitled to the protection of chapter 349 of the Laws of 1982 (the 1982 Loft Law), which added a new article 7-C, “Legalization of *137 Interim Multiple Dwellings”, to the Multiple Dwelling Law.
The tenants contend that the 1982 Loft Law was intended to be remedial and, therefore, to apply retroactively notwithstanding the fact that the law was enacted after the entry of final judgments and issuance of the warrants of eviction against them.
The landlord disputes these contentions, arguing, among other things, that the 1982 Loft Law was not intended to apply retroactively to these or any other tenants. Moreover, the landlord contends that the 1982 Loft Law does not apply to these proceedings because all review by appeal had been completed before the new statute had been enacted and, therefore, the proceedings were no longer pending on the effective date of the new statute; as a result, these judgments had vested and could not be subsequently impaired without violating the New York State and United States Constitutions.
In order to determine whether the 1982 Loft Law applies to these tenants, the court must first resolve a number of important questions. It must determine whether the 1982 Loft Law has retroactive application generally and, if so, whether this statute can be retroactively applied to a situation in which its application would impair rights that had vested because the parties’ right to appeal had expired.
If the court determines both of these questions in the affirmative, it must then consider whether these tenants are covered by the 1982 Loft Law — i.e., whether they meet the statute’s threshold requirements for residential occupants living in interim multiple dwellings — thereby qualifying them for its protections, and, if so, whether the landlord has complied with the reciprocal obligations and responsibilities imposed upon an owner by the statute, thereby entitling him to invoke its protections with respect to collecting rent and maintaining proceedings for possession for nonpayment of rent.
BACKGROUND OF THE CASE
These proceedings evolved in what has been aptly characterized as “the unregulated twilight zone of commercial loft conversions for residential reuse in our city, resulting *138 in widespread illegality, absence of housing code enforcement, hazards to health and safety, owner abuses and manipulation of tenants, and housing law confusion”, despite the existence of a 1977 law regulating such conversions (Multiple Dwelling Law, art 7-B). (Lipkis v Pikus, 96 Misc 2d 581, 584, mod 99 Misc 2d 518 [App Term, 1st Dept], affd 72 AD2d 697.)
Sometime back in September and October, 1977, a number of artist tenants living in several loft buildings on Walker Street owned by this landlord responded to what they believed to be breaches of the implied warranty of habitability and violations of the Multiple Dwelling Law and the Administrative Code of the City of New York by withholding their rent. This led to the landlord’s instituting summary nonpayment proceedings.
After a protracted trial, the trial court found, among other things, that the loft buildings in question constituted multiple dwellings. (Lipkis v Pikus, 96 Misc 2d 581, 588-590, supra.) The trial court also determined that the landlord was not in compliance with the laws regulating multiple dwellings for the period covered in the proceedings, in that he did not have a multiple dwelling registration number and a residential certificate of occupancy, and, consequently, pursuant to the statutory penalties imposed for these violations, was prohibited from collecting rent and recovering possession for as long as he remained in noncompliance. (Supra, at pp 590-591.)
As a result of these findings, the trial court dismissed the landlord’s petitions, barred the recovery of rent and possession, and directed that the rents deposited with the court or held in escrow by the tenants’ attorney be refunded to each tenant upon the submission of appropriate papers.
On appeal, the Appellate Term modified the trial court’s order to the extent of reversing the dismissal of the petitions and the direction to refund the rent on deposit and, instead, directed final judgment for the landlord. It then affirmed the order as modified but stayed enforcement of the final judgment until such time as the landlord obtained a certificate of occupancy in compliance with the Multiple Dwelling Law.
*139 The appellate court further directed the tenants to deposit any arrears in rent with the clerk of the Civil Court and to continue to deposit use and occupancy at the rate previously payable as rent as it became due, pending compliance by the landlord. It further specified that on proof of compliance the landlord could move to vacate the stay and to recover the fund on deposit and that, in the event of noncompliance, the stay would continue until it made a further order.
In explaining its decision, the court pointed out that both sides were aware of the illegal nature of residential occupancy under a commercial lease and were content to abide by that arrangement. “Having entered into possession fully cognizant of the existing realities, tenants should not now be permitted to reap the benefits of occupancy and, at the same time, avoid the payment of rent.” (Lipkis v Pikus, 99 Misc 2d 518, 520, supra.)
Consequently, the Appellate Term directed final judgment for the landlord but conditioned enforcement of the money portion of that judgment upon the procurement of a residential certificate of occupancy. It viewed this relief as “giving balance to the competing interests of both parties by avoiding unjust enrichment to the tenants and stimulating expeditious completion of the actions necessary to legalize the conversion.” (Lipkis v Pikus, 99 Misc 2d, at p 521, supra.) The Appellate Division unanimously affirmed on the majority opinion at the Appellate Term (72 AD2d 697), and the Court of Appeals dismissed a further appeal to it on jurisdictional grounds (51 NY2d 874).
After some initial confusion as to the amount of arrears to be paid into court and a subsequent judicial determination of those amounts in August, 1979, the tenants deposited their rent moneys into court. At some point, however, the landlord apparently stopped providing services (a contention the landlord does not effectively dispute). Although the Appellate Term had provided for a further order in the event of noncompliance in obtaining a certificate of occupancy, it gave no guidance to the tenants on the appropriate way to proceed in the event services were curtailed. Consequently, the tenants responded by again withholding their rent. The landlord then sought to vacate the stay and *140 direct entry of the final judgments and issuance of warrants of eviction by making a number of motions in the Civil Court, all of which were denied.
The landlord then appealed to the Appellate Term, which vacated the stay and ordered the entry of final judgments of possession only and issuance of eviction warrants but refused to release the fund on deposit with the court below. In explaining its decision, the court pointed out, “The rationale underlying our original decision was to encourage the legalization of this converted loft property by withholding rent from the owner until such time as a certificate of occupancy was obtained. As an incentive to that end, tenants were to secure the landlord by creating a fund of rent deposits in the lower court which would ultimately be released to the landlord upon completion of the necessary work.” (Lipkis v Pikus, NYLJ, Jan. 20,1982, p 11, col 1 [App Term, 1st Dept].) The court reiterated that its original decision had attempted to balance the competing interests of both parties by imposing correlative responsibilities upon each, observing, “To the extent tenants refuse to make their monthly deposits and insist upon remaining rent-free, our purpose is frustrated.” (Supra, p 11, col 1.) With respect to the moneys on deposit with the court below, it asserted, “the continuing goal of bringing the premises within the applicable multiple dwelling guidelines will best be served by retaining the fund on deposit so long as there is any likelihood that further renovation of the realty will be required.” (Supra, p 11, col 1.)
With this, its first opportunity to clarify the issue, the Appellate Term forcefully, but indirectly, answered the question left open in its original decision. Its message was unmistakable: withholding rent in the face of its prior direction to deposit it as it became due was not an acceptable method of getting services restored. The ambiguity now resolved, the tenants deposited the withheld moneys into court within a matter of days. They have continued to make their monthly payments to date.
The final judgments of possession were entered, and the warrants issued, on January 22, 1982.
*141 The tenants then made a series of motions to the Appellate Term, the Appellate Division, and the Court of Appeals seeking further review of the Appellate Term’s January, 1982 order and the Civil Court’s entry of final judgments. These efforts were unsuccessful. (Lipkis v Pikus, 56 NY2d 502, 612.)
The tenants then began an action in the United States District Court for the Southern District of New York. On June 10, 1982, the court denied the tenants’ request for injunctive relief and dismissed the complaint but granted a stay of eviction pending appeal to the United States Court of Appeals for the Second Circuit.
On June 21, 1982, the 1982 Loft Law (L 1982, ch 349) went into effect.
On August 12, 1982, the United States Court of Appeals affirmed the District Court’s decision. The tenants then moved in the Civil Court to vacate the final judgments and warrants of eviction based upon the 1982 Loft Law. On August 16, 1982, a Civil Court Judge signed an order staying any eviction of the tenants pending hearing of their motion. On August 17, 1982, the landlord applied to that Judge to vacate the stay. The Judge, after hearing both sides, substantially denied the landlord’s application, stating that the new loft legislation presented an overriding issue that had never been before any court.
On October 21, 1982, the Appellate Term, acting pursuant to CPLR 5704 (subd [b]), vacated the Civil Court orders of August 16 and 17 and lifted the interim stay of the warrants of eviction. (Lipkis v Pikus, NYLJ, Oct. 25,1982, p 6, col 3 [App Term, 1st Dept].) The tenants then immediately instituted a CPLR article 78 proceeding in the nature of prohibition to annul the Appellate Term’s order as jurisdictionally defective.
On November 1, 1982, the Appellate Division unanimously granted the tenants’ petition. It vacated the Appellate Term’s October 25 order, reinstated the temporary stay, and remanded the tenants’ motions to vacate the final judgments and warrants of eviction to the Civil Court for disposition. (Matter of Pikus v Dudley, 90 AD2d 700.)
*142 RETROACTIVITY OF 1982 LOFT LAW
The 1982 Loft Law (Multiple Dwelling Law, art 7-C, as added by L 1982, ch 349) has previously been held to have retroactive application “based upon judicial precedent, statutory construction and legislative intent”. (465 Greenwich St. Assoc. v Schmidt, 116 Misc 2d 62, 65.)
In addition to the factors analyzed by the Supreme Court in 465 Greenwich St. Assoc, v Schmidt (supra), this court notes the following. The inclusion in section 281 of the Multiple Dwelling Law (definition of “interim multiple dwelling”) of a requirement that a unit on December 1, 1981, have been occupied for residential purposes since April 1, 1980 (subd 1), as well as the extension of the statute’s protections under certain circumstances to residential occupants in units first occupied after April 1, 1980, and prior to April 1, 1981 (subd 3), indicates a clear legislative intent that the statute apply retroactively, for under these provisions the law must necessarily affect the rights and obligations of residential occupants under leases executed, and even expiring, prior to its passage. (See Gordon & Gordon v Madavin, Ltd., 108 Misc 2d 349, 351 [App Term, 1st Dept], affd 85 AD2d 937.) Moreover, the provision in subdivision 12 of section 286 of the Multiple Dwelling Law that no waiver of rights pursuant to this statute by a residential occupant qualified for its protection made prior to the effective date of this statute shall be accorded any force or effect further supports the Legislature’s intention that the new Loft Law have retroactive application.
As a general proposition, a judgment, after it becomes final, may not be affected by subsequent legislation. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 58.) This principle is subject to a fundamental historical exception, however. It is well settled that “the state may establish regulations reasonably necessary to secure the general welfare of the community by the exercise of its police power although the rights of private property are thereby curtailed and freedom of contract is abridged.” (People ex rel. Durham Realty Corp. v La Fetra, 230 NY 429, 442; accord East N. Y. Bank v Hahn, 326 US 230, 232-233; Nebbia v New York, 291 US 502, 523-525; Home Bldg. & Loan Assn. *143 v Blaisdell, 290 US 398, 437-438; Matter of Farrell v Drew, 19 NY2d 486, 493; Matter of Freeport Randall Co. v Herman, 83 AD2d 812, 813, affd 56 NY2d 832.)
Judgments fall within the purview of this time-honored exception, even though the parties’ right to appeal has expired. (People ex rel. H.D.H. Realty Corp. v Murphy, 194 App Div 530, affd 230 NY 654; People ex rel. Ballin v O’Connell, 194 App Div 540, affd 230 NY 655; People ex rel. Rayland Realty Co. v Fagan, 194 App Div 185, affd 230 NY 653.) These three cases were all affirmed by the Court of Appeals on its opinion in People ex rel. Durham Realty Co. v La Fetra (supra), which, like the 1982 Loft Law, involved a statute designed to remedy an existing emergency housing situation.
These cases dealt with the validity and retroactivity of chapter 942 of the Laws of 1920, which was enacted on September 20, 1920, and became effective on September 27,1920. This statute, declaring the existence of a housing emergency, prohibited the eviction of tenants under certain circumstances for two years.
In People ex rel. H.D.H. Realty Corp. v Murphy (supra), the landlord obtained a final judgment of possession, after trial, on September 16,1920, with issuance of the warrant stayed until October 1, 1920. In People ex rel. Ballin v O’Connell (supra), the landlord and tenant entered into a stipulation in open court providing for a final order of possession for the landlord (which was entered on July 22, 1920), with a stay of issuance of the warrant until October 1, 1920. In People ex rel. Rayland Realty Co. v Fagan (supra), the landlord obtained a final judgment of possession, after trial, on May 7, 1920, with the warrant stayed until August 1, 1920. On August 2, 1920, that order was amended by stipulation extending the stay until October 1, 1920, on the condition of no further stays.[1]
*144 In Murphy (supra) and O’Connell (supra), the Appellate Division, First Department, reversed the Supreme Court decisions denying retroactive application of the statute, despite its strongly expressed agreement with those denials. It did so in order to avoid different rules under the same statute in different parts of the same city because of the diametrically opposed position taken by the Appellate Division, Second Department, in-Fagan (supra), given that the Court of Appeals would soon be reviewing all three decisions with respect to the validity of the newly enacted statute.
The Appellate Division, First Department, expressed its opinion that the landlord in both Murphy (supra) and O’Connell (supra) had acquired a vested right to have a warrant issued on October 1 under a final order and that the landlord could not be deprived of this right by a subsequent legislative enactment. It explicitly stated in Murphy (supra, pp 537-538): “It is well settled that vested property rights under a final judgment or determination in the nature of a judgment cannot be affected by subsequent legislation. [Citations omitted.] The decision of the issue in favor of the relator and the granting of the final order constituted a judgment on the issues which, by failure to appeal therefrom, has become final, and of that unquestionably it was not competent for the Legislature to deprive the relator.” As to the stipulation in O’Connell (supra, p 542), the court said, “There is force in the contention [of the landlord’s counsel] that this constitutes a contract with respect to the remedy, of which the landlord could not be deprived by a subsequent act of the Legislature, even though it had power so to stay the remedy where there is no contract with respect to the remedy.”
On review of Murphy (supra), O’Connell (supra), Fagan (supra) and several other decisions pertaining to the statute in question, the Court of Appeals forcefully rejected the Appellate Division, First Department, interpretation that final judgments constituted vested rights that could not be affected by subsequent legislation, even where the right to appeal had expired. On the contrary, it held that the State *145 may enact laws impairing vested rights, as long as it does so pursuant to the proper exercise of its police power. The court declared, “The legislative or police power is a dynamic agency, vague and undefined in its scope, which takes private property or limits its use when great public needs require, uncontrolled by the constitutional requirements of due process. Either the rights of property and contract must when necessary yield to the public convenience, advantage and welfare, or it must be found that the state has surrendered one of the attributes of sovereignty for which governments are founded and made itself powerless to secure to its citizens the blessings of freedom and to promote the general welfare.” (People ex rel. Durham Realty Corp. v La Fetra, 230 NY 429, 442-443, supra.)
There can be no question that the 1982 Loft Law represents a valid exercise of the State’s police power. It was enacted pursuant to a declaration of serious public emergency with respect to residential occupancy of illegally converted commercial and manufacturing loft buildings due to an acute shortage of housing, among other legislative findings (Multiple Dwelling Law, § 280), and its provisions represent a reasonable and appropriate response to that emergency by imposing concomitant obligations and responsibilities, as well as protections, upon both owners and residential occupants of buildings qualified for its coverage.
The Legislature has broad discretion in determining both what the public interest requires and what-measures and means are reasonably necessary for the protection of those interests. (20 NY Jur 2d, Constitutional Law, § 224, p 328; see, e.g., East N. Y. Bank v Hahn, 326 US 230, 232-233, supra; Nebbia v New York, 291 US 502, 537-538, supra; Matter of Freeport Randall Co. v Herman, 83 AD2d 812, 813, supra.)
The test of reasonableness is met if the means adopted to carry out the legislative purpose are fairly appropriate under the circumstances, notwithstanding that the measure is not necessarily the best or the wisest response to the problem. (20 NY Jur 2d, Constitutional Law, § 225, p 329; see, e.g., Nebbia v New York, supra, at pp 537-538.) Within this framework, the 1982 Loft Law provides a reasonable *146 alternative for the protection of residential occupants of illegally converted loft buildings that qualify for its coverage under a declared housing emergency. As such, it represents a valid exercise of the State’s police power; consequently, its retrospective application does not violate the New York State or United States Constitution.
Recent appellate decisions have reinforced the retroactive application of emergency rent and housing legislation to pending evictions where the tenant is still in possession. Chapter 889 of the Laws of 1980 (the 1980 Loft Law) was found retroactive where final judgments were granted to the landlord before the statute’s effective date, but no warrants had been issued, the Appellate Term stating, “Since these proceedings remain pending and tenants are still in possession, the law should be liberally construed to accomplish its manifest purpose of halting the summary eviction of tenants residing in former commercial lofts.” (Gordon & Gordon v Madavin, Ltd., 108 Misc 2d 349, 351, supra.)
More recently, chapter 870 of the Laws of 1982, providing for a 10-day stay of issuance of an eviction warrant in a holdover proceeding based on breach of a lease provision so that a tenant may have an opportunity to cure the breach, was applied retroactively where a final judgment of possession was entered some three and a half months before the effective date of the statute. The court upheld the Housing Judge’s grant of final judgment to the landlord because of the breach but permanently stayed the issuance of the warrant in light of the new law, noting that its construction of the new statute to apply retroactively was “in accord with judicial precedent affording retroactive effect to remedial housing legislation”. (Langham Mansions Co. v Bodine, 117 Misc 2d 925, 927-928 [App Term, 1st Dept].)
The logic of those decisions where final judgments have been entered, but no warrants have been issued, has been extended to situations where warrants have been issued but not executed. In Whitmarsh v Farnell (298 NY 336, 344), the Court of Appeals found the New York City Rent Control Law (Local Laws, 1947, No. 66 of City of New York) retroactive, declaring, “The present [summary] pro *147 ceeding is designed to accomplish evictions. As the warrant, in and of itself, does not accomplish eviction until it is executed, and as it had not been executed on September 17, 1947, when Local Law No. 66 became effective, no eviction had taken place up to that date and accordingly the proceeding was then pending. That view has the support of adjudicated cases. [Citations omitted.] * * * It follows that the defendant — in protecting his rights as a statutory tenant — may invoke the provisions of Local Law No. 66 (1947).”
More recently, chapter 675 of the Laws of 1981, extending the protections of the rent stabilization laws to tenants of class B multiple dwellings, has been found retroactive to safeguard those tenants still in possession where the tenant was in possession only as a result of a stay of execution of an eviction warrant granted prior to the passage of the new law. (Tegreh Realty Corp. v Joyce, 88 AD2d 820.)[2]
In conclusion, this court holds that the 1982 Loft Law (Multiple Dwelling Law, art 7-C„ as added by L 1982, ch 349) was intended to have retroactive application and that this law can be retroactively applied to the facts of this case.
COVERAGE UNDER ARTICLE 7-C
Before the protections of the 1982 Loft Law can attach, a building must qualify as an “interim multiple dwelling” (IMD) as defined in subdivisions 1 and 2 of section 281 of the Multiple Dwelling Law. Subdivision 1 of section 281 provides: “Except as provided by subdivision two of this section, the term ‘interim multiple dwelling’ means any building or structure or portion thereof located in a city of more than one million persons which (i) at any time was occupied for manufacturing, commercial, or warehouse purposes; and (ii) lacks a certificate of compliance or occupancy pursuant to section three hundred one of this chapter; and (iii) on December first, nineteen hundred eighty-one was occupied for residential purposes since April first, nineteen hundred eighty as the residence or home of any *148 three or more families living independently of one another.” Subdivision 2 of section 281 sets forth various additional elements relating primarily to local zoning resolution requirements.
The parties do not dispute that the buildings in question comply with paragraph (i) of subdivision 1 and subdivision 2 of section 281. Although the landlord refused to concede at oral argument that the buildings lacked residential certificates of occupancy pursuant to section 281 (subd 1, par [ii]), he has produced no evidence that these buildings have the requisite certificates. At one point he did manage to obtain temporary (90-day) residential certificates of occupancy for some of the units in the subject premises, but these expired on January 21,1982, and he does not appear to have been successful in getting them renewed.[3] Absent proof of the required certificates these buildings fall within the confines of section 281 (subd 1, par [ii]).
The parties hotly contest the facts relating to section 281 (subd 1, par [iii]), however. The landlord asserts that those units for which he had obtained temporary residential certificates of occupancy prior to the enactment of the 1982 Loft Law should not be considered in computing IMD status, nor should any other “legally” occupied units (e.g., artist in residence [AIR] units), because the 1982 Loft Law was intended to deal only with illegally occupied units.
The landlord misconstrues the major thrust of article 7-C with respect to the legalization of residential units — i.e., to ensure that commercial and manufacturing loft buildings housing residential occupants are safe for residential use. The statute attempts to secure the provision of minimum housing maintenance standards and services essential to health, safety, and fire protection by mandating compliance with applicable building codes and laws setting forth such standards and services, to be achieved over a *149 prescribed period of time, for buildings meeting the statute’s definitional requirements. (See Multiple Dwelling Law, § 280 et seq., especially § 280.)
In recognition of this legislative mandate, the New York City Loft Board has specifically determined that only those residential and living-working units covered by a final certificate of occupancy issued prior to June 21, 1982, are to be excluded in calculating the number of units necessary to qualify as an IMD. (New York City Loft Board, Rules and Regulations Relating to Determination of Interim Multiple Dwelling Status and Issues of Coverage under Article 7-C of the Multiple Dwelling Law, promulgated April 13, 1983, § I [D] [2], The City Record, April 19, 1983 [hereinafter cited as Rules & Regs for IMD Status and Coverage].) Here, not only does the landlord no longer have even temporary residential certificates of occupancy, but his right to have obtained such certificates in the first place is in serious question.[4]
The Legislature has chosen to subject to article 7-C coverage only those loft buildings that contain three or more families living independently of one another, among other requirements set forth in section 281. This is the same number of families required for a building to qualify as a multiple dwelling pursuant to subdivision 7 of section 4 of the Multiple Dwelling Law. Buildings with fewer residential units are subject to much less stringent health, safety, and fire protection standards. Indeed, the number of AIR units in a building, for example, is strictly limited to two or less for precisely this reason.[5]
In view of this difference in standards and of the Legislature’s paramount concern in enacting the 1982 Loft Law, the loft board has specifically determined that officially designated AIR units and “joint living work quarters for artists” are to be included in counting the number of residential units necessary to qualify for IMD status. (Rules & Regs for IMD Status and Coverage, § I [D] [1] [b], M.)
*150 Moreover, nowhere in the statutory definition of an IMD is a distinction made between legal and illegal occupants. All residentially occupied units that otherwise meet the statute’s definitional requirements must be brought up to code compliance.
The landlord further contends that the five units occupied by the respondent tenants also should not be counted in determining compliance with section 281 (subd 1, par [iii]) because these tenants should rightfully have been evicted in June, 1980. This argument is totally without merit and is not worthy of any further response.
To accept this or any of the landlord’s contentions above with respect to legally versus illegally occupied units and temporary versus final residential certificates of occupancy would not only undermine the remedial effects that the Legislature intended in enacting article 7-C but also fly in the face of the explicit language of section 281 (subd 1, par [iii]) of the Multiple Dwelling Law, as well as the loft board’s rules and regulations.
Other than the above arguments, which this court has rejected, the landlord does not convincingly dispute the residential occupancy of the five units occupied by the respondent tenants for the requisite time period pursuant to section 281 (subd 1, par [iii]) of the Multiple Dwelling Law and section I (C) of the Rules & Regs for IMD Status and Coverage. In addition, the landlord concedes the residential occupancy of a sixth tenant in compliance with the statute.
Based on preliminary information supplied by both sides at the court’s request, there are an additional eight units that must be considered. Four of these units are residential but do not appear to meet the time requirements of section 281 (subd 1, par [iii]) of the Multiple Dwelling Law. In addition, the initial data supplied for the remaining four units does not conclusively establish compliance or noncompliance with the statute’s time requirements.
Thus, of the 14 potentially residential units in the buildings in question, a minimum of 6 clearly meet the time requirements of section 281 (subd 1, par [iii]), 4 do not appear at first blush to fall within the necessary time frame of that paragraph, and the status of 4 additional *151 units remains to be determined, if necessary, by a hearing at which both sides may introduce testimony and other evidence to support their respective preliminary written allegations as to compliance with section 281 (subd 1, par [iii]). An additional hearing may also be required to determine which of the latter eight units qualify for the protections of article 7-C pursuant to subdivision 3 of section 281 regarding units first occupied after April 1,1980, and prior to April 1, 1981.
Of the 6 units that unquestionably meet the time requirements of section 281 (subd 1, par [iii]), 3 are located within 55 Walker Street and 3 are td be found within 47-49 Walker Street, which this court finds to be a single building for the purpose of determining IMD status.
The landlord vigorously contests Judge Leonard N. Cohen’s finding, after trial, that 47-49 Walker Street constituted a single building (Lipkis v Pikus, 96 Misc 2d 581, 596-597, supra), claiming that neither res judicata, collateral estoppel, nor law-of-the-case principles apply here because the court’s finding was not essential to the resolution of the issues before it and because the circumstances have changed since Judge Cohen made his determination.
This court does not rely solely on Judge Cohen’s determination, however, although it can give his findings full weight. Moreover, the Appellate Term made no dispositive rulings regarding whether the buildings were separate, and in no way changed or modified the trial court’s findings on this issue. Judge Cohen found that both structures had been conveyed in a single deed, that the New York City Tax Department had consolidated both buildings into a single tax lot in 1968, and that heat, mail, and elevator services were provided by 47 Walker Street to both buildings. (Lipkis v Pikus, 96 Misc 2d 581, supra.)
With respect to the single deed and the single tax lot, this court finds Judge Cohen’s dispositions to be influential, contributing to the cumulative weight of the additional factors specified below. The fact that the buildings are capable of being sold or demolished separately despite the single deed and tax lot is irrelevant to the combined nature of their past and present use, and hypothetical future uses are purely speculative at this point. Addition *152 ally, the fact that the landlord has since chosen to discontinue central heating and mail service does not change the fundamental character of the buildings.
Above and beyond Judge Cohen’s findings, this court is persuaded by the fact that the landlord or his predecessors provided a service that makes the two buildings indivisible —- namely, common elevator service. The mere statement by the landlord that all that was done to provide elevator service to 49 Walker Street was to cut holes in the walls of both buildings in order to provide access to the elevator in 47 Walker Street is logically insufficient. Access from one building to the other would require more than simply holes in the walls. Access also requires common hallways and stairs to negotiate safely the two-foot difference in floor levels between the two buildings. The landlord’s suggestion that he can seal up these openings at any time is legally insufficient. To do so would constitute a reduction of essential services.
. As to language in the purported leases for 49 Walker Street executed after Judge Cohen’s decision permitting the landlord to discontinue elevator services at any time and at the landlord’s discretion, such lease provisions may in fact be unenforceable. The possibility that one or both buildings may be sold or demolished at some time in the unknown future, resulting in the termination of elevator service, is not only irrelevant but also speculative at best.
In addition, the possibility that the landlord could, cut off elevator service to 49 Walker Street, since that service is provided only through a lease agreement between Eliahu Lipkis as owner of 49 Walker Street and Eliahu Lipkis as owner of 47 Walker Street, is equally irrelevant and suggests a grander scheme for creating (loop)holes. If the landlord plans to create a multiple dwelling as defined in subdivision 7 of section 4 of the Multiple Dwelling Law (and the landlord’s activities since at least 1978 lead ineluctably to that conclusion), he will no doubt be required to provide elevator services to future residential occupants.[6]
Considering all of these factors — the single deed, the single tax lot, the former maintenance of central heating *153 and mail services, and especially the common elevator service, with access provided by openings cut through the abutting walls of both buildings and the necessary use of common hallways and stairs — this court finds that 47 and 49 Walker Street is one building.
In conclusion, the court finds that 47-49 and 55 Walker Street are IMD’s as defined in subdivisions 1 and 2 of section 281 of the Multiple Dwelling Law and that the units of the tenant respondents are covered by article 7-C.
COMPLIANCE UNDER ARTICLE 7-C
Many of the characteristics described by the original trial court in 1978, noted above, remain today, more than four years and two loft laws later. In March, 1982, after the enactment and subsequent expiration of chapter 889 of the Laws of 1980, which imposed a one-year moratorium on the eviction of those loft tenants who qualified for its coverage, the Appellate Division had occasion to comment on the charged atmosphere in loft situations: “At present there is a constant war of nerves and pressures between landlords and tenants with situations in which, on the one hand, tenants are left without services, and, on the other, landlords sometimes do not receive rent for years.” (Corris v 129 Front Co., 85 AD2d 176, 179.)
In mid-December, 1982, almost six months after the passage of article 7-C, which again attempted to deal with these problems, the New York City Loft Board reported an increase in landlord cutoffs of tenant services in loft buildings, in some cases because residential occupants were not paying rent and, in other cases, because landlords seemed to be trying to force tenants out of their lofts before the protections of the new Loft Law could take hold. The report also indicated that some loft tenants were not paying rent as a response to the absence of essential services. (New York City Loft Board, Loft Board Report No. 1-2, Dec. 13, 1982.)
Thus, these proceedings started and are now back again in the same general atmosphere of distrust and tension that has plagued the loft community (both owners and residential occupants) for many years, with one striking difference. Not only has a regulatory scheme been enacted, *154 but since December, 1982, the loft board has established registration procedures, has promulgated rules and regulations, and is setting up procedures for hearing disputes.
For better or for worse, “Now that a regulatory scheme is in place singularly addressed to the phenomenon of converted lofts, it should be followed in adjudicating the rights and obligations of landlords and tenants.” (Mordant Assoc. v Duval, NYLJ, Oct. 20, 1982, p 6, col 1 [App Term, 1st Dept].) If both sides are to receive the “benefits” afforded by the new Loft Law, they must live by its terms, including the obligations it imposes on them.
Sections 284 and 285 of the 1982 Loft Law set forth the respective obligations and protections for owners of interim multiple dwellings. Section 284 delineates the steps an owner must take, with corresponding timetables, to be entitled to collect rent without having a residential certificate of occupancy.
The initial step a landlord must take is to file with the loft board a notice of registration in conformity with all provisions of section 325 of the Multiple Dwelling Law and with rules and regulations promulgated by the loft board. (Multiple Dwelling Law, § 284, subd 2; New York City Loft Board, Rules and Regulations Relating to Registration of Interim Multiple Dwellings and Minimum Housing Maintenance Standards for Interim Multiple Dwellings, promulgated Jan. 27, 1983, § 2 [A], The City Record, Jan. 31, 1983 [hereinafter cited as Rules & Regs for IMD Registration and Housing Standards].)
As part of the registration process, a landlord who files for an IMD registration number for a particular building must agree to provide to eligible residential occupants the minimum housing maintenance services established by the loft board. (Rules & Regs for IMD Registration and Housing Standards, § 2 [A] [11].) In no event, however, may a landlord reduce services previously provided by lease or other mutual agreement where the services exceed those mandated by the loft board. (Rules & Regs for IMD Registration and Housing Standards, § 3 [B].)
Upon issuance of an IMD registration number by the loft board, the landlord of that IMD is deemed to be in compliance with subdivision 2 of section 284 of the Multiple *155 Dwelling Law, even though he or she has reserved the right to contest coverage before the loft board. (Rules & Regs for IMD Registration and Housing Standards, § 2 [A] [4];§2[B].)
If the landlord is in compliance with subdivision 2 of section 284 and the provisions of subdivision 1 of section 284 of the Multiple Dwelling Law as the deadlines for each step therein are reached, plus the pertinent loft board rules and regulations as they are promulgated, the landlord may then recover rent from residential occupants covered by article 7-C and maintain a proceeding for nonpayment of rent pursuant to subdivision 1 of section 285.
Where article 7-C coverage is disputed, however, the landlord may claim only those rents that become due after the date of issuance of an IMD registration number; recovery of rents allegedly due for periods prior to that date must await resolution of the coverage dispute. (See Rules & Regs for IMD Registration and Housing Standards, § 2 [B].)
The court does not have before it any proof of compliance with section 284 of the Multiple Dwelling Law and the loft board’s rules and regulations pertaining to that section. Upon presentation of proper proof, however, the landlord can recover that amount of rent from the tenants to which he will be entitled after the date of issuance of the appropriate IMD registration numbers,[7] subject to any claims or defenses by the tenants. This court will entertain an application to that effect at the appropriate time.
As to the back rent on deposit with the clerk of the Civil Court for the period preceding the issuance of IMD registration numbers to the landlord, any claims the tenants may have with respect to breach of the implied warranty of habitability (Real Property Law, § 235-b) are cognizable under article 7-C at least as far back as April 1, 1980 (Silverstein v Roof Bin, NYU, Dec. 16,1982, p 7, col 2 [App Term, 1st Dept]), and prior to that date by virtue of the *156 trial court’s 1978 determination that the premises were multiple dwellings (Lipkis v Pikus, 96 Misc 2d 581, 597, mod 99 Misc 2d 518, 520, supra).
Notwithstanding that fact, these moneys must remain on deposit until the Appellate Term’s further order.
In the meantime, the tenants must continue to deposit their monthly rent into court as it becomes due.
CONCLUSION
RPAPL 749 (subd 3) permits a court to vacate a warrant of eviction prior to its execution for good cause. In deciding whether to exercise its discretionary powers, the court must “weigh the possible harm engendered or benefit derived by the exercise of that discretion.” (New York City Housing Auth. v Torres, 61 AD2d 681, 683.)
The court’s determination that the respondent tenants are entitled to the protections of the 1982 Loft Law constitutes good cause for vacating the warrants of eviction in these actions. The benefits are manifold, the possible harm negligible. The remedial purposes of article 7-C will be effectuated. The tenants and their families will be able to remain in their homes in a period of acute housing shortage. Their buildings will be made safe for residential living in compliance with code standards. Essential services must be provided on a continuing and regulated basis. The potential harm to the landlord appears to be negligible, given that he is proceeding to bring the buildings up to code compliance in order to obtain residential certificates of occupancy. Accordingly, the final judgments stand, but the warrants of eviction are vacated.
The Appellate Term’s reasoning in its initial decision leaves no doubt that it did not contemplate the eviction of the tenants after the landlord had procured proper certificates of occupancy. This court’s decision attempts to effectuate the underlying rationale of the Appellate Term’s original order.
Given the power and persuasiveness of the Legislature’s findings, these tenants and their families must not be dislocated for their misguided violation of a court order. Under the circumstances of the existing housing emergency, the acknowledged strife between the landlords and *157 residential occupants of loft buildings, and the lack of clear-cut directions in the face of an apparent cutoff of services by the landlord, a more appropriate remedy may be civil contempt of court rather than evicting the tenants and their families. (See Judiciary Law, § 753, subd A, par 3.)

. In People ex rel. H.D.H. Realty Corp. v Murphy (194 App Div 530, 538) and People ex rel. Ballin v O’Connell (194 App Div 540, 541), the Appellate Division, First Department, noted that no appeal had been taken from the final order. In People ex rel. Rayland Realty Co. v Fagan (194 App Div 185), the Appellate Division, Second Department, made no mention of the status of any appeal, but the time to appeal the final judgment appears to have expired by the time the Court of Appeals rendered its decision on March 8,1921. Significantly, in Murphy, the Appellate Division found that the final judgment of possession had indeed vested precisely because of a failure to appeal from that judgment. (194 App Div, at p 538.) Moreover, in O’Connell, the final order had definitively vested on July 22,1920, because of a judgment by consent in a stipulation, *144 from which there could be no appeal because of lack of an aggrieved party. (See Siegel, NY Frac, § 525; CPLR 5501, subd [a], par 3, for the definition of an aggrieved party and the scope of appellate review.)

. Situations exist in which the court’s jurisdiction continues even after the execution of a warrant of eviction; however, the question of whether a statute may be retroactively applied to a proceeding in which the tenant is no longer in possession is not presently before this court. (See 3 Rasch, NY Landlord & Tenant [2d ed], Summary Proceedings, § 1387, pp 214, 215, n 11, 1983 Supp, p 44.)

. The tenants maintain that the landlord procured these temporary certificates on October 22, 1981, under questionable circumstances. The respondents’ statements that the Inspector General ordered that no certificates be issued to this landlord without his prior approval, and their subsequent issuance in contravention of his orders appear to be borne out by the landlord’s admission of having previously bribed a building inspector, as documented in Lipkis v Pikus (96 Misc 2d 581, 598), and by the inspection report of Richard Jacobs of the Mayor’s Office of Loft Enforcement, dated June 9,1981, as well as by the fact that these temporary certificates were never extended beyond the initial 90-day period.

. See n 3, supra, p 148.

. See New York City Department of Buildings, intradepartmental memorandum from Joseph Ferro, director of operations, to borough superintendents on “Use of Loft Studios by Artists for Living Purposes,” Sept. 19, 1961.

. Subdivision 6 of section 51 of the Multiple Dwelling Law requires every dwelling over six stories or more than 60 feet high to be equipped with at least one passenger elevator accessible to every apartment above the entrance story.

. Pursuant to subdivision 2 of section 286 of the Multiple Dwelling Law, the amount of monthly rent, plus the effective date of any increases, is to be determined according to the guidelines established by the loft board. (See New York City Loft Board, Order No. 1 — Interim Rent Guidelines — Dec. 21, 1982, The City Record, Dec. 27, 1982.)