OPINION OF THE COURT
Margaret Taylor, J.
This is a holdover summary proceeding. Respondents move to dismiss on two grounds: that the tenancy is projected by rent stabilization and that, even if it is not so protected, this proceeding was brought while respondent Schwartz was in possession pursuant to a valid lease.
In June, 1976, Ms. Schwartz entered into possession of her current apartment pursuant to a two-year lease which expired on May 31, 1978. In 1978 petitioner offered respondents a choice of a one-, two- or three-year renewal *813 lease. Respondents chose, and entered into, a two-year lease that expired on May 31, 1980.[1]
Petitioner bought the building in 1974. At that time the building indisputably contained four class A dwelling units. The parties disagree as to whether the remaining seven units were class A or class B units.
Gradually, these seven units were remodeled and transformed into three indisputably class A units. The building now contains seven class A units. In May, 1980, just before respondents’ two-year renewal lease expired, the building contained six class A units.
Petitioner argues that respondent’s apartment is not covered by rent stabilization because (1) in order for a building to be subject to rent stabilization under the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4 [ETPA]) it must contain at least six class A units, and (2) although this building concededly contained six class A units in May, 1980 when respondent’s second two-year lease expired, thr.ee of those may not be counted toward the required minimum of six because they had been rehabilitated from class B units after January 1, 1974.
The ETPA, made applicable to New York City by the city’s declaration of a housing emergency (New York City Council Resolution, No. 276, June 20, 1974), extends the New York City Rent Stabilization Law (Administrative Code of City of New York, § YY51-1.0 et seq.) to “a. Class A multiple dwellings not owned as a cooperative or as a condominium, containing six or more dwelling units *814 which: (1) were completed after February first, nineteen hundred forty-seven”. (L 1974, ch 576, § 7; La Guardia v Cavanaugh, 53 NY2d 67.) What the statute requires if it is to apply is not a building which contains six or more class A dwelling units but a class A multiple dwelling which contains six or more “units” simpliciter. (Matter of Schacht v City of New York Housing & Dev. Admin., 63 Misc 2d 1003.) The legislative purpose in requiring six or more “units” was to exclude small buildings from coverage. (Id.)
The threshold question is whether the building is a class A multiple dwelling. Neither the ETPA nor the Rent Stabilization Law of 1969 define class A and class B dwellings. Those terms appear to have been taken from section 4 of the Multiple Dwelling Law. Subdivision 8 of section 4 of that law defines a class A multiple dwelling as “a multiple dwelling which is occupied, as a rule, for residence purposes.” This class includes “apartment houses, *** and all other multiple dwellings except Class B multiple dwellings.” Subdivision 9 of section 4 of the Multiple Dwelling Law defines class B multiple dwelling as “a multiple dwelling which is occupied, as a rule transiently, as the more or less temporary abode of individuals or families' who are lodged with or without meals. This class shall include hotels, lodging houses, rooming houses, boarding houses, boarding schools, furnished room houses, lodgings, club houses, college and school dormitories”.[2]
Although the parties dispute whether the building was a class A or a class B multiple dwelling when petitioner bought it, they agree that in 1980 when respondent’s second two-year lease expired the building contained at least six apartments, i.e., six class A units. Whether the three units remaining at the time were apartments, as respondent maintains or rooms for transient dwelling, as petitioner contends, the building as a whole was composed preponderately of apartments meant for permanent residential purposes. As of May, 1980, at least, the building was indisputably a class A multiple dwelling. Since the building was not owned as a co-operative or as a condomin *815 ium and since it contained six or more units, those units were covered by the Rent Stabilization Law of 1969 unless exempted pursuant to section 5 of the ETPA.
Section 5 (subd a, par [5]) of the ETPA exempts from coverage “housing accommodations in buildings completed or buildings substantially rehabilitated as family units on or after January first, nineteen hundred seventy-four”. That a number of units in petitioner’s building have been rehabilitated since January 1, 1974 does not suffice to exempt either those units or the building as a whole from rent stabilization. The building as a whole, not merely individual units within it, must have been completed or substantially rehabilitated after January 1,1974 if the act is not to apply. (Goodman v Ramirez, 100 Misc 2d 881.) We turn, therefore, to the question whether as petitioner maintains, the building which contains respondent’s apartment has been “substantially rehabilitated as family units” on or after January 1, 1974.
In order for units in a building to be excluded from rent stabilization pursuant to section 5 (subd a, par [5]) because of “rehabilitation”, the statute requires three things: that the building (and not merely some units within it) be rehabilitated; that the rehabilitation be substantial; and that the substantial rehabilitation result in the creation of new family units. The exclusion in question is parallel to, and serves the same purpose as, the other exclusion provided for in the same sentence — the exclusion of units in newly constructed buildings. The purpose of each is to foster an increase in the number of residential dwelling units. Even new family units which have been created as the result of the substantial rehabilitation of a building may not come within the exclusionary terms of section 5 (subd a, par [5]). For example, if a person buys a decaying warehouse, guts it, and creates 20 shops and 6 apartments, that rehabilitation of the building as primarily commercial space would not serve to exclude the six newly created apartments from rent stabilization. Section 5 (subd a, par [5]) exempts units in a building substantially rehabilitated as family, units. The purpose of the section would be flouted unless that portion of a rehabilitation which results *816 exclusively in new family units be sufficient to constitute a substantial rehabilitation of the building.
One question remains: how to measure the substantiality of a rehabilitation. The amount of money spent on a rehabilitation cannot itself be the measure of the substantiality of that rehabilitation since that amount will vary according to the size and condition of the building. Nor, as petitioner would have it, can the ratio of the amount spent rehabilitating a building to the purchase price of that building serve as the measure. Since the cost of rehabilitation will typically vary far less by the location of the building than will the building’s purchase price, the same amount spent on rehabilitating two similar buildings may well represent largely different proportions of their respective purchase prices.
Further, a rent-stabilized building could be exempted, and the purpose of the ETPA flouted, by the conversion of only one or two units into luxury apartments. Indeed, in petitioner’s building, although some work has been done to benefit all units, two of the three new class A units have been created out of only two purportedly class B units. As petitioner testified, the brunt of the rehabilitation expense went into the creation of one class A apartment. “The biggest expense was gutting the 5 ‘rooms’ located on the top floor and replacing them with a new apartment including a working fireplace, a new kitchen, new floors, ceilings, walls, and a new bath.” When one adds to this the cost of installing new kitchens, bathrooms, and walls in, as well as generally fixing up, the other two new class A units, it is apparent that very little could have been done for the four pre-existing class A units. And, indeed, the evidence at trial bore out this conclusion. In contrast, in Goodman v Ramirez (supra), the entire building except for one preexisting class A unit was rehabilitated as family units.
The court is unwilling at this time to formulate a definitive measure of substantiality. Circumstances differ, and a variety of factors must be considered. At the very least, however, the proportion of new family units created as a result of the rehabilitation to the number of pre-existing family units will be an important factor. Absent unusual circumstances, not alleged here, a rehabilitation which *817 does not at least double the number of family units in the building cannot be deemed a substantial rehabilitation of the building within the meaning of section 5 (subd a, par [5]) of the ETPA. Here, the building contained four class A units when petitioner bought it. Now that petitioner has completed the rehabilitation, it contains seven. Particularly in the circumstances of this case, where a vastly disproportionate portion of the rehabilitation costs was expended in the creation of one luxurious apartment, such a rehabilitation as family units is not substantial within the meaning of section 5 (subd a, par [5]).
Neither respondent’s apartment nor the building in which it is falls within any of the other exclusions of section 5.
Accordingly, on June 1, 1980, respondent’s apartment was covered by rent stabilization, and petitioner’s letter of May 27, 1981 purporting to terminate respondent’s tenancy without cause was ineffective. The petition is therefore dismissed.

. Petitioner now claims that the tenant is not Ms. Schwartz but Bomark Fabrics and argues that a corporation cannot benefit from the protections of the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4). Petitioner, however, knew from the start of the tenancy that Ms. Schwartz would be residing in the apartment; Ms. Schwartz’ application to lease contained information about her but none about Bomark (other than that she worked for Bomark); the lease is a residential one; there is no claim that corporate business was transacted in the apartment in violation of article 2 of the lease; a letter of petitioner’s dated May 5, 1980 asking whether the tenant wished to renew the soon to expire lease is addressed to “Miss H. Schwartz” and refers to “your lease”. Although Ms. Schwartz chose to have the lease in Bomark’s name and to pay rent checks on Bomark’s account, there is no dispute that in fact this was at all times a residential tenancy. The “tenant in possession” was at all relevant times Ms. Schwartz, and there is no suggestion that the apartment was not occupied by her as her “primary residence”. (Emergency Tenant Protection Act of 1974, § 5, subd a, par [11].) It is settled law that where the premises are used as a residence, it is of no significance that the lease is with a corporation. (Associated Realties v Quadrant Dev. Corp., NYLJ, Feb. 21, 1980, p 10, col 1 [App Term, 1st Dept].)

. A “multiple dwelling”, of course, is “a dwelling which is *** occupied as the residence or home of three or more families living independently of each other.” (Multiple Dwelling Law, § 4, subd 7.)