OPINION OF THE COURT
Bentley Kassal, J.
facts
This an action for injunctive and declaratory judgment relief with respect to a five-story building occupied by plaintiffs at 131-135 Duane Street, between Church Street *361 and West Broadway, New York City, located within the geographical area of Manhattan known as Tribeca.
The 80-year-old loft building contains approximately 5,000 square feet on each floor. It is undisputed that the basement and ground floor of the building were used exclusively for commercial purposes. The dispute between the parties focuses upon whether the residential use of the other floors by plaintiffs entitles them to status as rent-stabilized tenants. Plaintiffs, for the most part, occupy these other floors as artists’ studios pursuant to individual standard form of loft leases. Although the leases restricted the parties to occupancy for commercial purposes, the credible evidence adduced at trial overwhelmingly establishes that (1) defendants knew that the loft tenants had simultaneously established residence in the building and that (2) plaintiffs intended to reside there despite their knowledge of the lease prohibition to the contrary.
As of January 1, 1974, there were two residential tenants on the third floor, two on the fourth floor and one on the fifth floor. The parties dispute the date when the fifth floor premises were subdivided to create two dwelling units. Nancy Barber, assignee of the fifth floor space by assignment entered into February 20, 1974, allegedly took possession in March of that year, at which time, she claims she began building a wall to subdivide and create a separate living area. She testified that she placed a newspaper advertisement on June 20,1974, to sublease the balance of her space and, on July 2, 1974, a lease was entered into with Patricia Herzfeld for a one-year and five-month term to commence August 1, 1974, terminating December 31, 1976. According to plaintiffs, Ms. Herzfeld actually took possession of the disputed area by moving in furniture prior to the signing of the lease. Refuting defendants’ assertion that they had no knowledge that construction had been undertaken on the fifth floor and that they did not consent to the lease arrangement with Herzfeld, plaintiffs contend: (1) agents of the owner visited the loft area to inspect the construction and to repair the sprinkler system; (2) the fire marshal inspected the sprinkler tank and system; and (3) Ms. Herzfeld was introduced to and met with the owner’s building agent.
*362 In opposition, defendants challenge the sufficiency of the sublease to Herzfeld, referring, inter alia, tó the failure to produce Herzfeld to testify at trial; the fact that the renewal of Barber’s lease on November 4, 1976, recited therein that Barber was in possession of the entire fifth floor; and the failure to obtain the consent of the landlord for either the Herzfeld sublease or the subsequent subleasing of that portion of the fifth floor to Elizabeth Peters in 1976. Also alluded to is the assertion that, although, according to Barber, construction on the wall was completed April, 1976, insulation was ordered as late as May 21, 1974.
The event which precipitated this litigation was the issuance by the city in or about October, 1978, of a violation against the building for residential use in contravention of the certificate of occupancy and the zoning regulations for the Tribeca district. In response thereto, in November of that year, defendant Sylvan Lawrence notified each of the tenants as to the violations and the illegal residential use of the loft units, contrary to the express terms of the leases. On or about September 27, 1979, plaintiffs filed complaints with the Conciliation and Appeals Board of the Rent Stabilization Association of New York (CAB). Although more than three years has elapsed, no determination has been rendered by the CAB with respect to the claim by plaintiffs that their respective tenancies were subject to rent stabilization and, as such, they were entitled to renewal leases of one, two or three years, at a fixed rental increase in accordance with the established guidelines. All of the leases provided for renewal rentals at twice the original rental upon expiration of the lease term.
Contending that defendants had acted improperly in refusing to recognize plaintiffs as residential tenants and to accord to them renewals pursuant to rent stabilization guidelines, plaintiffs commenced this action in October, 1979, for multiple relief. After a lengthy trial, I dismissed the several causes of action, preserving only the second, third and fourth causes as alleging viable claims for relief and reserved decision thereon. The three remaining causes seek related injunctive and declaratory judgment relief, *363 plaintiffs alleging that they are entitled to the coverage and protection of the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4; ETPA) and the New York City Rent Stabilization Law (Administrative Code of City of New York, § YY51-1.0 et seq.). Claiming entitlement to rent-stabilized status, with the right to renewal leases at fixed rental increases, plaintiffs seek a permanent injunction enjoining defendants from any attempt to terminate existing residential tenancies or to dispossess plaintiffs from their lofts, pending disposition of the complaints presently before the CAB. In their third cause of action, plaintiff tenants demand judgment declaring that their respective lease arrangements were and are for residential purposes, protected by both the ETPA and the Rent Stabilization Code. Related declaratory judgment and injunctive relief is sought with respect to the attempt by defendants to enforce the lease provisions directing plaintiffs, as holdover tenants, to pay twice the rent due under their original lease agreements. The fourth cause seeks declaratory judgment and injunctive relief to enjoin defendants from alleged threats, coercion and harassment in attempting to dispossess plaintiffs, with an additional request for attorney’s fees incurred pursuant to section 234 of the Real Property Law.
At the close of the trial, I concluded on the record that the landlord has full knowledge that the tenants did intend and actually did use the premises for residential purposes, despite provisions to the contrary in the leases and without objection by the landlord. I likewise concluded that the tenants, at all times, had knowledge that their residential use was contrary to the terms of the lease agreements and in violation of the certificate of occupancy and applicable zoning regulations. The legal issue left to be resolved is what are the relative rights and obligations of the parties and, in particular, whether plaintiffs herein are entitled to the protection afforded by the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4) and the Rent Stabilization Law. Related thereto is the issue that the lease provision doubling the rental during the period each tenant holds over is unconscionable and, therefore, unenforceable. The tenants contend that the clause may not properly *364 constitute liquidated damages, since the rent established bears no reasonable relation to the fair rental value of the premises as of the time the lease was made. Accordingly, they claim that the provision is an unenforceable penalty. Plaintiffs likewise seek reasonable attorney’s fees for the alleged failure of the landlord to offer renewal leases to plaintiffs as rent-stabilized tenants.
DISCUSSION
In contending that the ETPA is inapplicable here, defendants argue that the statute only applies where a multiple dwelling has six or more dwelling units as of the base date. Primary reliance is placed upon (1) 465 Greenwich St. Assoc. v Schmidt (NYLJ, May 12, 1982, p 7, col 5) and Lipkis v Krugman (111 Misc 2d 445), finding that the statute only applies to multiple dwellings with six or more dwelling units in existence on or before January 1, 1974; and (2) 123 East 18th St. Corp. v Gisler (113 Misc 2d 718), suggesting July 1, 1974 as a base date.
To the contrary, the statute on its face does not require that a building contain six residential units as of a particular date in order to qualify for rent stabilization status. Section 5 of the ETPA sets forth the exceptions to the applicability of the statute. Paragraph (4) of subdivision a thereof excludes “housing accommodations in a building containing fewer than six dwelling units”. Notably absent is any reference to a cut-off date. Such a cut-off date may not be read into the statute merely by reason of the fact that the 1980 amendment to paragraph (4) was made effective as of July 1, 1974 (L 1980, ch 69, §§ 5, 7). Moreover, the January 1,1974.date alternatively relied upon by defendants, is contained within section 5 (subd a, par [5]) of the ETPA and excludes “housing accommodations in buildings completed or buildings substantially rehabilitated as family units on or after January first, nineteen hundred seventy-four”. That paragraph has no applicability to the issues raised in this case and no compelling reason appears to apply the January 1, 1974 date contained in paragraph (5) to the exclusion provided for in paragraph (4), when the Legislature did not so provide.
In La Guardia v Cavanaugh (53 NY2d 67, 70), holding that the ETPA did not extend rent stabilization to tenants *365 residing in class B multiple dwellings, the court had occasion to comment with respect to the confusion generated as a result of “the maze of relevant rent laws” presently in effect: “A ‘patchwork’ of legislation that has responded to decades of social, economic and political pressure, it has been characterized by this court as an ‘impenetrable thicket confusing not only to laymen but to lawyers’ (Matter of 89 Christopher v Joy, 35 NY2d 213, 220).”
No reason appears, however, to add to the confusion by engrafting upon the statute conditions not expressly provided for and which are at variance with the underlying legislative purpose. The ETPA exists as an enabling act to empower the city to extend rent stabilization as a result of the increasing public emergency which required the regulation of residential rents (ETPA, § 3). Following the enactment of the statute, the city invoked its protective provisions by a declaration of emergency by the city council: “ ‘[T]he Council hereby determines that * * * [an] emergency exists and will continue to exist for all classes of housing accommodations within the City of New York’ (New York City Council Res No. 276, June 20, 1974)” (La Guardia v Cavanaugh, supra, p 76).
The broadly worded resolution is wholly inconsistent with the argument advanced by defendants. They seek to preclude plaintiffs from the rent stabilization protection afforded by the ETPA as a result of the sixth dwelling unit having allegedly been added by the sublease to Ms. Herzfeld on July 2, 1974, one day after the alternate base date sought to be applied herein. Since it is patently clear that the same housing emergency existed at least one day subsequent to the base date relied upon by defendants, consistent with the resolution of the city council, any such holding would frustrate the underlying legislative purpose.
Moreover, aside from the foregoing, were I inclined to apply the July 1, 1974 base date to section 5 (subd a, par [4]) of the ETPA, which I am not, there was ample proof adduced to conclude that a dwelling unit had been created prior to that date. The proof, albeit disputed by defendants, established that the prime tenant had completed the division of the fifth floor loft into two dwelling units in May of *366 that year and that the subtenant moved in her furniture and belongings prior to execution of the sublease on July 2, 1974.
Nevertheless, under the facts and circumstances of this case, whether the sixth dwelling unit was created on or before July 2, 1974, is without dispositive effect. To be entitled to rent stabilization protection, all that the statute requires is that the multiple dwelling contain six dwelling units. Neither the legislative provision nor the most recent expression of opinion by the Appellate Division, First Department, referred to a particular base date as a necessary prerequisite to coverage under section 5 (subd a, par [4]) of the ETPA (Cooper v Schube, 86 AD2d 62, 67). As this court concluded at the close of the trial, both the tenants and the landlord were fully aware that the loft premises were used for residential purposes, contrary to the terms of the lease and the existing certificate of occupancy. The landlord, having condoned, if not encouraged the conversion to such use, may not now be heard to complain or effect removal of plaintiffs from the category of residential housing protected by the ETPA. Under the circumstances, there is a sufficient showing to find that the subject premises constituted a de facto multiple dwelling under the Multiple Dwelling Law (Lipkis v Pikus, 96 Misc 2d 581, revd in part on other grounds 99 Misc 2d 518, affd 72 AD2d 697; Mandal v Pitkowsky, 102 Misc 2d 478, affd 76 AD2d 807; Gordon & Gordon v Madavin, Ltd., 108 Misc 2d 349, affd 85 AD2d 937; cf. Corris v 129 Front Co., 85 AD2d 176).
It is undisputed that a proceeding is presently pending before the Conciliation and Appeals Board of the Rent Stabilization Association, complaints having been filed by plaintiffs more than three years ago, in September, 1979. Having determined that plaintiffs are entitled to the protective provisions of the ETPA and, accordingly, to status as rent-stabilized tenants, any determination with respect to the rent to be paid and related issues concerning rent stabilization, are matters to be decided, in the first instance, through appropriate administrative channels in the proceeding before the CAB (see 520 East 81 St. Assoc. v Lenox Hill Hosp., 38 NY2d 525, 528; Mehlman Mgt. Corp. v *367 Meyers, 51 AD2d 949; cf. Axelrod Co. v Duffin, NYLJ, Sept. 3, 1982, p 6, col 1).
One such related issue appropriately to be disposed of by the CAB is the propriety and applicability here of the contested lease provisions directing the holdover loft tenants to pay double the existing rental as liquidated damages. In view of this disposition entitling plaintiffs to rent-stabilized status, with lease renewals and rent increases pursuant to Rent Stabilization Law standards, it is questionable whether these holdover rent provisions will be enforceable. This, however, is a matter more appropriately for the CAB.
Until such an administrative determination is rendered, however, plaintiffs are entitled to injunctive relief to maintain the status quo, enjoining defendants from any action to dispossess plaintiffs from the premises and from terminating pre-existing lease arrangements. This relief shall be conditioned upon plaintiffs continuing existing monthly rental payments and paying all arrearages, computed on the basis of rentals accepted by the landlord prior to the expiration of the lease. The underlying circumstances and the interests of all parties warrant prompt attention by the CAB toward the expeditious resolution of the pending matter.
Shortly after the conclusion of this trial, Governor Carey signed into law chapter 349 of the Laws of 1982, amending the Multiple Dwelling Law by adding a new article 7-C thereto. The statutory provision was designed to meet the emergency created by the large number of conversions of commercial and manufacturing loft buildings to residential use, without compliance with applicable laws and building codes. The statute creates a new category of building, entitled “interim multiple dwelling”, defined, in part, as a building containing “the residence or home of any three or more families living independently of one another.” (Multiple Dwelling Law, § 281, subd 1.) The statute also creates a loft board, with full authority to set rents and make adjustments thereto. The clear purpose of the statutory enactment is to confer upon the loft board all issues with respect to coverage, including rent disputes *368 and to remove these matters from the courts (see Axelrod Co. v Duffin, NYLJ, Sept. 3, 1982, p 6, col 1, supra).
Both parties in their posttrial memoranda, have argued with respect to the applicability of the new loft law to the facts at bar. Although the statute by its terms took effect “immediately” and appears to have retroactive application, it is not controlling with respect to the relative rights of the parties in this action. This proceeding was commenced in October, 1979, in the main, for a determination of the parties’ rights and obligations at that time. Although it is now claimed that plaintiffs are still residential tenants of the building, entitled to protection as qualified residential occupants of an interim multiple dwelling under article 7-C of the Multiple Dwelling Law, that issue was not and could not be raised by the pleadings and was not before the court upon the trial. The sole issue tried before me was the protection to be afforded these plaintiffs under the ETPA and whether any rights thereunder conferred status as rent-stabilized tenants. Any issue pertaining to the present rights and status of the parties under the new loft conversion law would more appropriately be a matter to be passed upon by the loft board in adherence to the procedures and format established by the new enactment. The within disposition does not preclude the parties from so proceeding.
Despite the determination herein that plaintiffs are entitled to ETPA protection as rent-stabilized tenants, their claim for attorney fees under section 234 of the Real Property Law lacks merit. The statute provides in part as follows: “there shall be implied in such lease [a lease of residential property which makes provision for the landlord to recover attorneys’ fees] a covenant by the landlord to pay to the tenant the reasonable attorneys’ fees and/or expenses incurred by the tenant as a result of the failure of the landlord to perform any covenant or agreement on its part to be performed under the lease or in the successful defense of any action or summary proceeding commenced by the landlord against the tenant arising out of the lease”.
The statute thus provides for two situations under which a recovery of counsel fees may be obtained. Clearly, the second such situation (the successful defense of an action or *369 summary proceeding commenced by the landlord) does not apply here, since the within action was brought by the tenants for a declaration as to their rights and related injunctive relief. In Eaton v New York City Conciliation & Appeals Bd. (56 NY2d 340), the Court of Appeals reversed the order of the Appellate Division, First Department (sub. nom. Nesbitt v New York City Conciliation & Appeals Bd., 85 AD2d 581), reserving to Special Term the determination of whether the landlord’s refusal to offer a renewal lease under rent-stabilized terms would constitute a failure to perform a covenant or agreement within the contemplation of section 234 of the Real Property Law. Judge Wachtler, writing for the unanimous court, observed (56 NY2d, at p 346): “Finally, the issue involving petitioners’ claim for attorneys’ fees should be remitted to Special Term for further consideration as to whether the landlord’s refusal to offer renewal leases in rent-stabilized terms constituted a failure to perform a covenant or agreement as is requisite to the application of section 234 of the Real Property Law.”
Contrary to plaintiff’s suggestion, Eaton does not require an award of counsel fees in every case. Rather, the determination is left to the discretion of the trial court, taking into account the underlying facts and circumstances involved. In the present case, there was a real dispute between the parties as to their relative rights and obligations under the state of the law as it existed at the time the suit was commenced. The action was litigated and tried by able counsel, who thoroughly briefed the legal issues which had been raised. At the conclusion of the trial, I found that both parties had proceeded in good faith in their dealings with each other. Under the circumstances, the insistence by the landlord that plaintiffs were not entitled to renewal leases as Rent Stabilization Law tenants was apparently made in good faith, the parties electing to proceed to a judicial determination of their respective rights and duties. Although recent judicial dispositions and legislative enactments have aided the court in reaching a determination, I cannot, under the circumstances, conclude that the action of the landlord, in proceeding to a judicial resolution, amounted to a failure to *370 perform a covenant Or agreement of the lease, so as to entitle the tenants to an award for attorneys’ fees and expenses incurred.
This constitutes the decision of the court pursuant to CPLR 4213. Settle judgment in accordance with the foregoing, before the Justice to be designated by the Administrative Judge, New York County (CPLR 9002), with counsel to submit suggestions with respect to the appropriate undertaking to secure the injunctive relief herein provided pending the administrative disposition before the Conciliation and Appeals Board.