OPINION OF THE COURT
Leona Freedman, J.
The primary issue in this summary holdover proceeding is whether respondents’ apartment is exempt from the coverage of the Rent Stabilization Law (Administrative *887 Code of City of New York, § YY51-1.0 et seq.) under section 5 (subd a, par [5]) of the Emergency Tenant Protection Act of 1974 (L 1974, ch 576, § 4; ETPA). Section 5 (subd a, par [5]) provides that “housing accommodations in buildings completed or * * * substantially rehabilitated as family units on or after January first, nineteen hundred seventy-four” are exempt from rent stabilization.
The building is located at 1687 Third Avenue in the upper east side. It was originally constructed before 1901 and was classified as an old law tenement.[1] It has also been classified as a class A multiple dwelling since at least 1957 when the second of three major renovations was completed. The first renovation in 1937 consisted of iron and steel work for structural support as well as masonry and carpentry. The layout of the building before and after the 1937 alteration was the same as it is today; eight residential units (two on each floor of the four-story structure) and one ground level storefront.[2]
In 1953 the building underwent a second major renovation, resulting in the conversion of the residential units on the street level into additional commercial space for the storefront. In 1972 or 1973 the final major renovation of the building began. The commercial space at the rear of the lot was converted back to residential units and the entire building, including the commercial space, was completely gutted and modernized. New bathroom and kitchen facilities, windows, and a brick facade front were installed and the plumbing, wiring and heating systems were replaced.[3]
Work was completed on the-second through fourth floors by October, 1973 when an application for a temporary certificate of occupancy was submitted by petitioner’s predecessor in interest. The temporary certificate of occupancy, certifying that the work complied with the building and fire code and the applicable zoning resolutions, was issued in January, 1974. When the work on the first floor was finished in May, 1974, a certificate of occupancy for the entire building was issued that same month.[4]
*888 Respondent tenants entered into possession pursuant to a written lease agreement for a three-year term, commencing June 1, 1980. In May, 1981, petitioner’s managing agent sent respondents a letter demanding additional moneys because “the landlord of a rent-stabilized apartment is entitled to an increase in the security deposit in order for it to equal one month’s rental”. The tenants complied. In January, 1983, petitioner landlord offered tenants an option to renew their lease for an additional one-, two- or three-year term consistent with the requirements of section 23 of the Code of the Rent Stabilization Association of New York City, Inc. (Rent Stabilization Code). The tenants elected a two-year term, but since the landlord was seeking an 89% rental increase, they refused to execute the renewal lease.[5] Their lease expired in May, 1983. Petitioner then initiated this holdover proceeding in August, 1983, alleging for the first time that the apartment was not subject to rent stabilization as a result of renovations begun in 1973.
SUBSTANTIAL REHABILITATION DEFINED
The phrase “substantial rehabilitation as family units” is defined by looking at the building as a whole, not the work completed on a particular unit (Goodman v Ramirez, 100 Misc 2d 881 [Gammerman, J.]). The mere listing of sums expended does not in and of itself determine what is “substantial” since that “will vary according to the size and condition of the building” (Hickey v Bomark Fabrics, 111 Misc 2d 812, 816 [Taylor, J.]; 120 Misc 2d 597 [App Term, 1st Dept]). At the very least, (1) new family units should be added to the housing stock and should predominate over the number of pre-existing units (Hickey v Bomark Fabrics, supra, p 817; see, also, 120 Misc 2d, at p 599 [for example, by the conversion of a commercial or largely commercial structure into dwelling units]), or (2) the multiple dwelling status of a building should be upgraded (Goodman v Ramirez, supra). In Goodman, all the units in the entire building, except for one pre-existing class A unit, had been converted from class B dwelling units (designed primarily for transient or single-room oc *889 cupancy) to class A dwelling units (designed for permanent family residences). In Hickey, the building contained four class A units and seven class B units before renovation and after renovation it contained seven class A units. Since the building was essentially residential before the landlord began construction, the Appellate Term commented (p 599) that “to consolidate some class B dwelling units into class A dwelling units” was not enough to qualify for exemption from rent stabilization.
STATUTORY CONSTRUCTION
The ETPA is remedial legislation enacted under a declaration of emergency, which expands the protections and restrictions of the Rent Stabilization Law, as here, to multiple dwellings constructed before 1947.[6] Although there is no definition of the term “substantially” or the phrase “substantially rehabilitated as family units”, under the rules of statutory construction they should be interpreted in light of the remedial purposes of the ETPA and the statutory scheme of the Rent Stabilization Law.[7]
First, the Stabilization Law (Administrative Code, § YY51-6.0, subd c, par [6], cl [b]) and section 41 of the Rent Stabilization Code provide that an owner is to be compensated on a dollar-for-dollar basis for any building-wide major capital improvement, which would appear to include many, if not all, of the improvements which petitioner has performed in the case at hand.[8] As to expenditures for those improvements which do not fall within section 41, *890 “improvements in a particular dwelling unit other than a major capital improvement”, compensation eventually can be gained under section 20 (subd C, par [l]).[9] To read section 5 (subd a, par [5]) of the ETPA as qualifying a building for exemption whenever major capital improvements or something less than major capital improvements are completed would render meaningless subdivision C of section 20 and section 41, which contemplate apartments remaining within the rent stabilization system. Section 5 (subd a, par [5]) must signify something more or different; either (1) the upgrading in the multiple dwelling status of a building as in Goodman (supra) or (2) the conversion of a commercial or largely commercial structure to multiple dwelling units as indicated by the Appellate Term in Hickey (supra). Such an interpretation of section 5 (subd a, par [5]) will encourage the expansion of the housing stock by the creation or addition, in a significant way, of permanent residences and is consistent with the remedial purposes of the ETPA, which was enacted because of an “acute shortage of housing accommodations”. (ETPA, § 2.)
Second, the ETPA was also enacted to “prevent exaction of unjust, unreasonable and oppressive rents and rental agreements and to forestall * * * disruptive practices tending to produce threats to the public * * * welfare” (ETPA, § 2). Here, petitioner attempted to impose upon respondents an 89% rental increase when the Rent Guidelines Board had only permitted a 7% increase. Even if such an increase could be justified on a cost basis, section 5 should not be interpreted in a manner that would permit the circumvention of section 41 and subdivision C of section 20 of the Rent Stabilization Code. These provisions allow for an increase in stabilized rents for building-wide capital improvements and ordinary repairs to be paid by the tenants over a 60- or 40-month period of time.
*891 Third, the renovation work performed included work on the commercial premises. Although it did result in the addition of two residential units, bringing the total to eight from six, the additional represented a “re-conversion” of commercial space back to its prior residential status as class A dwelling units. These two units contain three rooms and each is less than half the size of any of the other six pre-existing units. Particularly when weighed as a proportion of the pre-existing units (see Hickey v Bomark Fabrics, 111 Misc 2d 812, 816, supra), they are not such a contribution to the housing stock so as to warrant a finding that all eight residential units should be removed from the rent stabilization system.
Finally, even assuming that the work performed on petitioner’s building could be characterized as a “substantial rehabilitation”, the work on the building as a whole was essentially completed before January 1, 1974. The temporary certificate of occupancy for the upper floors (six residential units), No. 74207, and the papers submitted in support of its issuance show that renovation work had been actually completed in October, 1973. It was only the issuance of the certificate, certifying that the work performed conformed to the requirements of law, which was delayed until after January 1, 1974.
Accordingly, the petition is dismissed.
DAMAGES FOR BREACH OF THE WARRANTY OF HABITABILITY AND RENT OVERCHARGES
In a breach of warranty counterclaim “ ‘[i]t is the obligation of the trial court to determine the value of the services of which the tenants are deprived, the severity of the violation at issue, the extent and duration of any deprivation, and the responsiveness of the landlord in dealing with the problem’ ” (Fraley Realty Corp. v Stocker, 115 Misc 2d 52 [App Term, 1st Dept]). Tenants are not required to pay for services they did not receive (Goldner v Doknovitch, 88 Misc 2d 88, 91 [App Term, 1st Dept]). Here, the unrebutted testimony of Mr. Walz, one of the tenants, established that the tenants were subjected to the following conditions: (1) no heat and hot water for 18 days; (2) no light in the common hallway (except on average of two days a month) and a malfunctioning intercom system since the inception of their tenancy more than three years ago; *892 (3) an unsanitary and garbage-strewn common hallway for at least a year’s period of time; and (4) a roach-infested kitchen for an unspecified length of time. Under these circumstances, the court cannot say that the sum fixed by the respondents in their answer, $1,350, which represents an abatement of three months’ rent, is unreasonable.
Regarding the rental overcharge counterclaim, there is no explanation of how the tenants arrived at the sum of $1,591.20 in their answer. The only proof introduced at trial established that the tenants objected to the petitioner’s attempt to charge an 89% rental increase for a two-year lease renewal. There was nothing to indicate that the rental of $450, which they were paying during their last written lease term, or any prior rental charged was excessive or illegal. This counterclaim must therefore be dismissed.
Finally, the third counterclaim of the tenants, which seeks an order compelling the landlord to tender them a two-year renewal lease at a rental no greater than that permitted by the Rent Guidelines Board must also be dismissed. It seeks relief injunctive in nature and not within the jurisdiction of the Civil Court (see Wilen v Harridge House Assoc., 94 AD2d 123; Dworkin v 417 East Realty Assoc., NYLJ, Nov. 2, 1983, p 6, col 3 [Lehner, J.]; CCA 110, 202, 203).
Judgment for respondent in the sum of $1,350.

. See Multiple Dwelling Law, § 4, subd 11.

. See final report of construction inspector and papers submitted in support of its issuance, alteration application No. 3318 of 1937 and 1974 certificate of occupancy.

. See building plans and specifications, dated March 21, 1972, May 9, 1972 and April 16, 1974.

. See temporary certificate of occupancy, No. 74207, and papers submitted in support of its issuance and certificate of occupancy No. 74601.

. Order No. 14 of the Rent Guidelines Board in effect at the time the tenants’ leases expired provided for a maximum increase of 7% for a two-year lease renewal.

. The Rent Stabilization Law of 1969 included all buildings containing six or more dwelling units constructed between 1947 and 1969. As a result of vacancy decontrol (L 1971, ch 371), various apartments were “destabilized”. Effective July 1, 1974, the Emergency Tenant Protection Act then “restabilized” apartments which had been destabilized and added additional apartments to the rent stabilization system, including apartments in buildings containing six or more dwelling units which had been decontrolled under provisions of the Rent Control Law.

. The meaning of undefined words depends on the meaning of the whole act. Words absolute in themselves and the broadest and most comprehensive language may be qualified and restricted by reference to other parts of the statute, or by the facts to which they relate. Not only are different parts of the same act interpreted together, but different acts which are in pari materia are to be construed each in light of the other (McKinney’s Cons Laws of NY, Book 1, Statutes, § 97). Also, statutes designed to promote the public good should receive a liberal construction and be expounded in such a manner that they may, as far as possible, attain the end in view. They should not be construed so as to advance a private interest at the expense of the public good. (McKinney’s Cons Laws of NY, Book 1, Statutes, § 341.)

. See Rent Stabilization Association of New York City, Inc., Rent Stabilization Association Digest (1983 ed, pp 53-55), as to renovation work determined to be a “major capital improvement” by the Conciliation and Appeals Board under section 41 of the Code of the Rent Stabilization Association of New York City, Inc.

. Subdivision C of section 20 of the Code of the Rent Stabilization Association of New York City, Inc. provides in pertinent part that:
“[flor dwelling units for which there has been since May 31, 1968 * * * an increase in rental value beyond required services from:
“the installation of new equipment or improvements in a particular dwelling unit other than a major capital improvement, the monthly stabilization rent for the dwelling unit shall be increased by l/40th of the total cost of such * * * improvements, including the cost of installation thereof”.
This increase, however, “shall not be collectible during the term of a lease then in effect or any renewal thereof except upon written consent of the tenant”. (§ 20, subd C, par [1].)