OPINION OF THE COURT
David B. Saxe, J.
The twentieth century may well be remembered as an era in which legislatures at all levels of government attempted to substitute regulations of their own making for the rules which are generally thought to govern economic relationships in the marketplace. Whether such intervention was wise or effective is a question best left to future social historians with the relative advantage of hindsight. It is appropriate, for the moment, merely to observe that where the regulations promulgated by lawmakers conflict with the laws of economic reality, there arise powerful incentives for all concerned to devise a way to circumvent them.
The plaintiffs are tenants who moved into the premises around which this proceeding revolves, at a time when the building was devoted largely to commercial use. The defendants are a cooperative corporation, its sponsor and a major shareholder who have invested large sums in renovating the building for use as a residential cooperative. The plaintiffs request reformation of the commercial leases which they signed to encompass residential use, together with declaration that they are protected by the Rent Stabilization Law (Administrative Code of City of New York § YY51-1.0 et seq.) under which they claim a right to remain in possession under mandatory renewal leases.
The defendants move for partial summary judgment for rent arrears. The plaintiffs cross-move for partial summary judgment, for an order dismissing defendants’ affirmative defenses and for immediate trial of any remaining issues.
*256 The plaintiffs’ cross motion seeks summary judgment as to their 1st, 5th, 6th, 8th, 9th and 11th causes of action and “those parts of their 4th and 7th causes of action proved by evidence herewith submitted.” They seek dismissal of affirmative defenses to their 3rd, 7th, 9th and 12th causes of action. Since the pleadings subject virtually the entire case to summary judgment, this court will liberally exercise the prerogative to search the record in the interest of bringing this matter to an expeditious conclusion. The prerogative extends both to the motion for summary judgment (Wilkinson v Skinner, 34 NY2d 53 [1974]) and to the motion to dismiss the affirmative defenses (Rand v Hearst Corp., 31 AD2d 406 [1st Dept 1969], affd 26 NY2d 806 [1970]).
Plaintiffs seek reformation of their leases to allow residential use (1st and 5th causes of action), injunction of the cooperative offering plan pursuant to General Business Law §§ 352-e and 352-ee (8th and 9th causes of action), deduction of payments made to Con Edison for utilities (11th cause of action), damages for harassment and retaliation and rent overcharges (4th and 7th causes of action), fraud (3rd cause of action), emotional distress (10th cause of action), wrongful eviction (12th cause of action), and costs and fees, including reasonable attorney’s fees (6th cause of action). In addition, plaintiffs assert breach of the implied warranty of habitability (2nd cause of action).
The history of attempts by the courts to balance the interests of a tenant who has invested money and effort to render loft space amenable to human habitation and those of an owner who has invested money to convert a commercial building into cooperative apartments has been marked by an attempt to apply laws to a situation which the draftsmen never envisioned (see, Corris v 129 Front Co., 85 AD2d 176). It has been a tortuous effort at regulation and the results are unspectacular.
Even so basic a question as whether the Rent Stabilization Law should be applied to premises which contained fewer than six dwelling units as of January 1974, has been the subject of considerable debate (compare, Lipkis v Krugman, 111 Misc 2d 445, with 123 E. 18th St. Corp. v Gisler, 113 Misc 2d 718, and Duane Thomas Loft Tenants Assn. v Sylvan Lawrence Co., 117 Misc 2d 360).
Much of the plaintiff tenants’ case rests on their claim to rent-stabilized status. Plaintiffs contend that the issue has already been decided in their favor by virtue of the decision in Captain Crow Mgt. v Caligula Amusements (Civ Ct, NY County, L&T 124554/79) which involved the penthouse in the same *257 building. Citing Mandel v Pitkowsky (102 Misc 2d 478, affd 76 AD2d 807) the court held in Caligula that the subject commercial building was a de facto multiple dwelling subject to Multiple Dwelling Law §4 (7). It therefore dismissed the petition on account of the petitioner’s failure to file a multiple dwelling registration statement pursuant to Civil Court rule 2900.21 (f) (22 NYCRR). The court went on to apply the dictum of Mandel to the effect that the premises fell within the scope of the Rent Stabilization Law. It is clear, however, that the tenants in Mandel had occupied their apartments for many years (“approximately 12 years”, 102 Misc 2d, at p 480), that the landlord had given assurances that steps necessary to legalization of residential occupancy would be taken, that some efforts had been made in this direction and that, in the opinion of Appellate Term, First Department, none of the exemptions in the Emergency Tenant Protection Act § 5 (ETPA; L 1974, ch 576, § 4, as amended) applied to the case. Quite apart from any factual differences with Mandel, it is equally clear that the court in Caligula never considered the relevance of the ETPA exemptions to the matter before it. Finally, dictum founded upon dictum is not entitled to collateral estoppel effect (Siegel, NY Prac § 465). The tenants’ reliance on this case is therefore unfounded.
In considering the issue of rent-stabilized status, the ETPA § 5 (a) provides, in pertinent part:
“A declaration of emergency may be made * * * as to all or any class or classes of housing accommodations in a municipality, except * * *
“(4) (a) housing accommodations in a building containing fewer than six dwelling units * * *
“(5) housing accommodations in buildings completed or buildings substantially rehabilitated as family units on or after January first, nineteen hundred seventy-four” (emphasis added).
The first question which arises concerns the Legislature’s use of the phrase “all or any class or classes of housing accommodations”. In this regard, it is noted that lofts were not regarded as a “class” of accommodations recognized under State housing statutes until “interim multiple dwellings” were defined in the “Loft Law” (Multiple Dwelling Law art 7-C, as added by L 1982, ch 349), nearly a decade after the ETPA was drafted.
Plaintiffs allege that, as of January 1974, there were five lofts in use as residential units. The rest of the building was presumably empty commercial space. By June of 1974, it is claimed that *258 there were six units being used for residential purposes. Under these facts, is the building subject to the Rent Stabilization Law by virtue of the cited ETPA provisions?
The decision in 129 E. 56th St. Corp. v Harrison (122 Misc 2d 799 [App Term, 1st Dept 1984]), construed ETPA § 5 (a) (4) (a) to require six residential units as of June 20, 1974 (the date the New York City Council declared an emergency) in order for rent stabilization to apply. On the strength of the allegations in plaintiffs’ moving papers, this statutory condition has been fulfilled and defendants may not rely on this exemption to exclude them from the statutory scheme.
The substantial rehabilitation exemption of ETPA § 5 (a) (5) is another matter, however. It cannot reasonably be disputed that the subject building has undergone substantial renovation and that it has been converted from commercial to residential use. Out of the 10 floors ultimately used for living space, 5 were converted to residential use subsequent to January 1974. Under even a strict interpretation of the statutory exemption, the subject building clearly falls within its purview (see, e.g., Goodman v Ramirez, 100 Misc 2d 881; Hickey v Bomark Fabrics, 111 Misc 2d 812, affd on other grounds 120 Misc 2d 597; Matter of Romanow v Heller, 121 Misc 2d 886). A more liberal construction exempts any unit converted from commercial to residential use after January 1, 1974 (Lipkis v Krugman, 111 Misc 2d 445, supra).
These cases interpret the substantial rehabilitation exemption and require that the entire structure be substantially renovated and not just the individual unit sought to be exempted. The obvious problem with this approach is that a renovation project of this magnitude is likely to extend over a number of years and to involve large amounts of capital. To be practical, it requires that the building be emptied to permit the work to proceed efficiently. But, the rent control laws as a whole render such a rehabilitation project virtually impossible. Given the pressure which artificially low rents exert on profitability, it is unlikely that smaller landlords could obtain the necessary financing. But, even ignoring the capital requirements, the antipathy of the regulatory structure towards the eviction of tenants makes such an undertaking impractical.
An alternative construction of the statute was suggested in Lipkis v Krugman (supra), which, although not followed in its broader implications, is arguably applicable to the instant matter. There, the court held that “the creation of a residential unit out of a unit previously used solely for commercial purposes *259 constitutes a substantial rehabilitation of the space in question” exempting the unit from the Rent Stabilization Law (supra, at pp 446-447). Adopting this reasoning, at least those units in the subject building which were converted to residential use subsequent to January 1, 1974 would be exempt from the Rent Stabilization Law.
While a unit-by-unit approach might render rehabilitation attractive to the average landlord, the view which has prevailed is that the entire building must qualify in order for the statutory exemption to apply. While there is some doubt as to the precise meaning of the term “substantial rehabilitation” (see, Matter of Romanow v Heller, supra) it is agreed that the intent of the statute was to promote the creation of new residential units (supra, at p 890; Hickey v Bomark Fabrics, supra, at p 815). Looking at the subject premises as a whole, it is clear that the renovation conforms to both the spirit and the letter of the law. The doubling of the number of units amenable to residential use on or after January 1,1974 constitutes the substantial rehabilitation of the building within the contemplation of the ETPA.
Having concluded that the subject premises are exempted from the Rent Stabilization Law by virtue of ETPA § 5 (a) (5), it must again be stressed that this analysis presumes the direct applicability of these statutes to the loft conversion situation. In the opinion of this court, however, statutes not drafted to govern a particular situation serve only as guides to assist in analyzing the facts and should not be literally applied. Rather, the outcome should be determined by a consideration of the equities which arise from the facts presented by the specific case. In this regard, it is helpful to analogize to contract law and examine the reasonable expectations of the parties at the time the agreement was entered into, together with their motivation for entering into an agreement not sanctioned by law and their awareness that the agreement was not legal.
From the perspective of a landlord, the renting of commercial space for residential occupancy is clearly not legal under the applicable law (Multiple Dwelling Law § 300 et seq.). However, economic considerations outweigh the risk of being cited for violations, and rent obtained from residential loft tenants may be the only alternative to an empty structure with no income-producing potential. From the perspective of a tenant, acquiring nearly 2,000 square feet of living space for $350 to $450 a month is a bargain not to be passed up. While the space may be less than ideal for a residence, it is amenable to professional use, giving it an obvious economic advantage over the alternative of *260 renting both a residential apartment and separate commercial space. Given the general situation, it may safely be concluded that both sides will be strongly motivated to overlook the prevailing legal technicalities.
The parties to this action were obviously aware that the arrangement they were making was not legal. Both must be presumed to have known the law. Further, the lease the tenants signed is clearly designated as a loft lease, and residential use is made contingent on not being cited as a violation by any governmental agency. In view of the provision that, in the event a violation is issued, “tenant shall cease to use the premises for dwelling purposes and, upon dismissal or removal of any violation, may continue to use the premises for studio purposes”, tenants cannot claim that their rights to residential occupancy were more than tenuous or that they were unaware of existing legal realities. Any contention that, at the time the leases were negotiated, tenants could reasonably have expected to be issued renewal leases, or to derive any other benefits from the rent stabilization laws, is therefore not plausible. In sum, were this case to be decided on the basis of contract law principles, this court would be constrained to find the parties in pari delicto and would refuse the tenants the relief requested.
It has already been pointed out that the facts of this case stand in marked contrast to those of Mandel v Pitkowsky (supra) where there was a strong element of reliance by the tenants upon landlord’s assurances that the building would be upgraded for legal residential occupancy. Here, there is merely an arm’s length transaction in which both sides were willing, if not eager, to overlook legal niceties in favor of simple economic benefit. While plaintiffs allege that material misrepresentations were made by defendants, no proof is offered to support this allegation.
Since these premises are not governed by the Rent Stabilization Law, the plaintiffs’ demands for relief predicated on this regulatory scheme are rejected. Nor have tenants established any basis in law or equity to support reformation of their leases. Finally, most of the asserted defects in defendants’ offering plan concern tenants’ status under the Rent Stabilization Law and are not misrepresentations in light of this court’s holding. Those which remain are simply de minimus and will not support injunctive relief.
Tenants rely on the decision of the Court of Appeals in Richards v Kaskel (32 NY2d 524 [1973]) for standing to challenge the validity of the offering plan. Quoting Judson v Frankel *261 (279 App Div 372, 374) the court stated (p 534) that tenants “ ‘have the right to test out the question as to whether the cooperative scheme proposed by the defendants is a device to evade and circumvent the emergency rent control laws intended for [their] protection.’ ” Because plaintiffs have established no rent control law under which they are protected and because none of them has purchased any shares in the cooperative corporation, this court concludes that plaintiffs lack standing to challenge the offering plan. While the courts of this State have adopted “liberalized attitudes towards standing” (Matter of Whalen v Lefkowitz, 36 NY2d 75, 77-78), plaintiffs must still establish a connection between asserted misrepresentations and some detriment to their interests, economic or otherwise. Under the circumstances, the existence or nonexistence of an offering plan is immaterial to plaintiffs’ rights as tenants; plaintiffs have failed to demonstrate any way in which they would benefit from a declaration that the offering plan is null and void or from an injunction against the offering of units for sale. Such a finding is without prejudice to any challenge of the adequacy of disclosure before the Attorney-General.
Having concluded that plaintiffs do not fall within the purview of the rent control laws and have failed to establish grounds for equitable relief, it should be noted that they are hardly without statutory protection. Multiple Dwelling Law article 7-C (Loft Law) makes the Emergency Tenant Protection Act applicable to the subject premises under a declaration of emergency passed by the City Council on April 26,1983 (Resolution No. 369). The pleadings indicate that defendant, West Chamson Corporation, has obtained an interim multiple dwelling registration number for the premises pursuant to Multiple Dwelling Law § 284 (2). Issues involving claims for rent adjustment are generally within the authority of the Loft Board (Multiple Dwelling Law § 282 [c]). However, because of the inapplicability of the Rent Stabilization Law, it would appear that it is incumbent upon this court to determine the amount to be paid for use and occupancy (Multiple Dwelling Law § 285 [1]; Korn v Meislin, NYLJ, Jan. 3, 1985, p 4, col 1 [App Term, 1st Dept]). Questions as to the current rent to be paid, offsets for payment of utility charges and abatements, if any, for alleged breach of the implied warranty of habitability (Real Property Law § 235-b) may normally be determined by the Loft Board (Dundee Equity Corp. v Klein, 103 AD2d 692 [1st Dept 1984]). It is appropriate to note, however, that, contrary to plaintiffs’ contention, they are not entitled to withhold rent until a certificate of occupancy is obtained by defendants (Corris v 129 Front *262 Co., 85 AD2d 176 [1st Dept 1982], supra; Trans World Maintenance Servs. v Dedic, 105 AD2d 609 [1st Dept]).
It is likewise appropriate to point out that this case raises a novel question regarding the applicability of the warranty of habitability (Real Property Law § 235-b). The statute deems the warranty to be a covenant contained in any written or oral rental agreement. Can tenants rely on a covenant when the lease in which it is deemed to be incorporated has long since expired, and tenants’ continued occupancy is clearly without legal authority? Moreover, where any asserted breach results from reasonable and necessary work in conjunction with renovations undertaken upon ample notice to the tenants holding over, can the warranty nevertheless be enforced? I do not believe so.
The warranty of habitability is a device designed to avoid the hardship which would result from a strict application of the principle of independent lease covenants (Park W. Mgt. Corp. v Mitchell, 47 NY2d 316 [1978]). In effect, it conditions the tenant’s obligation to pay rent on the landlord’s provision of essential services (Geffner v Phillips, 123 Misc 2d 127 [Civ Ct, NY County 1984]). It is clear, however, that the warranty of habitability presumes a valid rental agreement, either under a binding lease or by operation of law (Callahan v Reid, 119 Misc 2d 190 [Civ Ct, Kings County 1983]). In the instant matter, tenants can point to neither.
Even if a. right to assert the warranty were to be conceded, its application to the facts at bar is inappropriate. To the extent that the tenants chose to remain in the building knowing of the landlord’s plans to renovate it and to the extent that the work undertaken was reasonable to carry out the planned renovation, they cannot complain that their use and enjoyment of the units they refused to vacate was interfered with. To hold otherwise would permit a party, illegally occupying space in a building, to frustrate the owner’s right to make lawful use of his property. Such a result offends the principles of equity under which plaintiffs’ prayer for relief is brought. Such a result also serves to promote the “constant war of nerves and pressures between landlords and tenants with situations in which, on the one hand, tenants are left without services, and, on the other, landlords sometimes do not receive rent for years” (Corris v 129 Front Co., 85 AD2d 176, 179 [1st Dept 1982], supra). I therefore hold that the plaintiffs may not assert the warranty of habitability to abate defendants’ claim for rent accruing after the expiration of their leases, either before the court or the Loft Board. However, in setting an amount for use and occupancy, a court may consider the condition of the premises.
*263 Under the circumstances presented by this case, plaintiffs’ claim that defendants have engaged in harassment and retaliation within the meaning of Real Property Law §§ 235-d and 223-b is simply not credible. As a matter of law, section 235-d is inapposite because it contemplates only a tenant in occupancy “pursuant to a written lease or other rental agreement” (subd [3]) and excludes lawful termination of a tenancy from its scope (subd [2]; Taylor v Haddad Corp., 118 Misc 2d 253 [Sup Ct, NY County 1983]).
There are ample grounds upon which landlord’s action to terminate the tenancies may be predicated which preclude a finding of retaliation under Real Property Law § 223-b. In this regard, plaintiff’s tenth cause of action which claims defendants “intentionally caused plaintiffs mental and emotional distress and anguish” is also without foundation.
As to the asserted wrongful eviction of plaintiffs Baxter and Forman, this court is at a loss to discover any statement in the voluminous pleadings which bears on the circumstances surrounding their surrender of possession. The amended complaint states only bare conclusions of wrongful evictions which are insufficient to defeat this motion to dismiss for failure to state a cause of action (Baly v Chrysler Credit Corp., 94 AD2d 781 [2d Dept 1983]).
This court has examined the pleadings and can discern little merit to plaintiffs’ case. The facts of this matter do not suggest that tenants were deluded into believing that they would acquire a vested interest in the subject premises. Nor do the pleadings suggest a systematic course of illegal or oppressive conduct by defendants designed to oust plaintiffs from possession. Rather, this is a classic case of tenants attempting to establish a legal basis for a more or less possessory interest in premises they do not own, while the owner tries to distinguish the housing accommodations from those for which the law mandates automatic renewal leases, the objective being handsome profit from cooperative conversion if he succeeds. Both sides are motivated by economic gain and characterized by opportunism; each seeks to construe the law to its own advantage.
Unfortunately for plaintiffs, they have failed to establish any grounds for injunctive relief for reformation of their leases to provide for residential use, striking the clause prohibiting residential use as unconscionable, unjust enrichment of defendant, enjoining the offering plan or ordering the restoration of tenants Baxter and Forman to possession. Accordingly, the 1st, 5th, 7th, *264 8th, 9th and 12th causes of action are dismissed. Plaintiffs have not established misrepresentation in their leases nor reliance on the asserted misrepresentation, and the 3rd cause of action for fraud is likewise dismissed. Neither have plaintiffs established grounds for harassment and retaliation, and the 4th cause of action is therefore dismissed.
While it has not been made the subject of summary judgment by virtue of either the motion or cross motion, the 10th cause of action seeking damages for the intentional infliction of emotional distress is without foundation in either law or fact and is dismissed in the interest of justice.
In accordance with this court’s findings on the merits, plaintiffs’ motion to dismiss defendants’ affirmative defenses is denied. Plaintiffs’ motion for summary judgment on their 6th cause of action for costs and attorney’s fees is also denied.
As to plaintiffs’ 2nd cause of action, an immediate trial is directed to determine whether there exist grounds to abate rent during the period plaintiffs occupied their respective units under valid leases. At the trial, the court shall also determine use and occupancy to be paid for the period following expiration of the respective leases during which plaintiffs’ 11th cause of action to deduct amounts paid for utilities may be considered.
Defendants’ cross motion is granted insofar as requiring tenants to pay all amounts in arrears, calculated at the rent last paid, to defendants forthwith.